[No. F054234. Fifth Dist. May 4, 2009.]

OMEGA GARCIA, Plaintiff and Respondent, v.
RONALD G. ROBERTS et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., III. and IV.

**COUNSEL**

The Law Office of John Derrick and John Derrick for Defendants and Appellants.

McCormick, Barstow, Sheppard, Wayte & Carruth, William H. Littlewood and Nicholas C. Miller for Plaintiff and Respondent.

**OPINION**

**KANE, J.**—Plaintiff Johnny Garcia brought suit for breach of oral contract, fraud and related causes of action when defendants Ronald G. and Sherry Roberts allegedly reneged on their agreement to allow plaintiff to purchase certain real property located in Sanger, California. Plaintiff claimed during discovery that his agreement was based solely on an oral loan arrangement, not a written contract. Plaintiff died prior to trial and his wife, Omega Garcia, was permitted to continue plaintiff's lawsuit as his successor in interest. After trial commenced, plaintiff (through Omega Garcia as

successor in interest) moved to amend the complaint to add a new cause of action for breach of a *written* contract for an option to purchase the real property.[1] The trial court granted the motion to amend over defendants' objections and the jury subsequently found in plaintiff's favor on all causes of action, including breach of written contract. Judgment was entered on the verdict.[2] Defendants appeal on several grounds, including that the trial court abused its discretion in allowing the amendment during trial, the oral contract cause of action was invalid as a matter of law, and there was no substantial evidence to support the jury's findings of liability on any of the causes of action. Although we agree that the trial court abused its discretion in granting leave to amend, in all other respects we affirm the orders and judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

*Factual Background Prior to Plaintiff's Lawsuit*

The parties' dispute concerns a parcel of land located on Academy Avenue in Sanger, California (the property). Plaintiff originally rented the property, along with a mobilehome situated there, from an entity known as the Sasashima Family Trust for $500 per month. Plaintiff lived in the mobilehome and also ran a modest business as a backhoe operator from there. In 2001, plaintiff entered into negotiations with Akiko Sasashima, the trustee of the Sasashima Family Trust, to purchase the property. In October or November of 2001, an agreement was reached giving plaintiff an option to purchase the property for $140,000. Pursuant to that agreement, plaintiff paid the sum of $7,500 to the Sasashima Family Trust and was given two years to come up with the remaining balance of the purchase price ($132,500), with the $7,500 counting as a downpayment. In the interim, plaintiff agreed to continue paying $500 in monthly rent.

Plaintiff found it difficult to obtain financing to pay the $132,500 balance to the Sasashima Family Trust. Eventually, he mentioned this fact to an

---

[1] For convenience, we generally use the term "plaintiff" with respect to the procedural history of the case even after plaintiff died and his wife became his successor in interest. Since the lawsuit continued to be in plaintiff's name, we refer to plaintiff in the masculine throughout our opinion.

[2] Defendants moved for a judgment notwithstanding the verdict (JNOV) and for a new trial. The trial court granted a limited new trial on the issue of damages only, but otherwise denied defendants' postjudgment motions.

acquaintance, defendant Ronald Roberts.[3] Plaintiff occasionally performed backhoe work for Mr. Roberts, who was a plumbing contractor. During one such job, plaintiff asked Mr. Roberts if he would be willing to loan the money to plaintiff. According to plaintiff's deposition testimony introduced at trial, plaintiff and Mr. Roberts entered into an oral agreement regarding the property. Under the terms of the oral agreement, Mr. Roberts agreed to pay the $132,500 balance of the purchase price to the Sasashima Family Trust as a loan to plaintiff, but title to the property would be put in Mr. Roberts's name and plaintiff would be required to pay interest on the loan of 12 percent or approximately $1,325 per month for a period of two years. By the end of the two-year period, plaintiff was to secure financing to pay off the loan, whereupon title would be conveyed to plaintiff.

In reliance on this oral agreement, plaintiff facilitated the sale of the property from the Sasashima Family Trust to defendants. The Sasashima Family Trust sold the property to defendants for $132,500, a price that was apparently based on the fact that plaintiff previously paid $7,500 toward the $140,000 purchase price. With additional closing costs, defendants obtained title to the property for a total sum of $133,027. Escrow closed on September 26, 2002.

On September 26, 2002, shortly after escrow closed, defendants asked plaintiff and his wife to come to their home to sign paperwork regarding the property. Defendant Sherry Roberts presented a form contract entitled "LEASE WITH OPTION TO PURCHASE" (the lease-option agreement). After Mrs. Roberts filled out the lease-option agreement, she read all or most of the terms out loud and provided additional explanation of the terms as she read them. This was apparently done because plaintiff spoke some English, but could not read it, while plaintiff's wife did not understand English at all. All four parties then signed the lease-option agreement.[4]

The gist of the lease-option agreement was that plaintiff and his wife would lease the property for a period of two years beginning on September 26, 2002, at the end of which time they could exercise an option to purchase the property by giving written notice. Rent for the lease term was expressed as "[t]welve percent (12%)" or $1,330.27 per month. This amount was based on defendants' desire to earn 12 percent interest on the money they paid the

---

[3] When necessary to refer to one of the defendants individually, we do so by name (i.e., Mr. Roberts or Mrs. Roberts). When referred to together, we use the term "defendants."

[4] Defendants testified the purchase of the property for a period of two years was suitable to their interest in making a "1031 exchange."

Sasashima Family Trust in purchasing the property. The portion of the lease-option agreement describing the option stated that the purchase price of the property was $133,027 and that the option could be exercised "at any time during the period beginning October 26, 2004, and ending October 26, 2004, by giving [defendants] sixty (60) days written notice at any time prior to _____, ___." The last blank was never filled in.[5] Mrs. Roberts testified that the October 26, 2004 date was meant to give plaintiff a one-month grace period in which to exercise his option to purchase the property after the lease term ended in September of 2004.[6]

In 2004, plaintiff began the process of seeking to qualify for and obtain financing to purchase the property from defendants. Plaintiff started working closely with a mortgage broker by the name of Gilbert Servin, who was owner of Su Casa Mortgage Company. Mr. Servin helped plaintiff "clean up" his credit history and improve his credit score. With Mr. Servin's assistance, plaintiff's credit score improved significantly by August of 2004. At that point, Mr. Servin "knew that [he] could get [plaintiff] a loan" to complete plaintiff's purchase of the property. Accordingly, Mr. Servin opened an escrow regarding the property with Stewart Title Company on August 19, 2004, a preliminary title report was requested from the title company and plaintiff took steps to procure homeowner's insurance. Additionally, Mr. Servin submitted a home loan application to Countrywide Financial Corporation on plaintiff's behalf and ordered an appraisal of the property.

In late August or early September of 2004, Mr. Servin placed a telephone call to Mr. Roberts to discuss the status of the escrow and to confirm the terms of the sale to plaintiff. Mr. Roberts confirmed that the agreement was to sell the property to plaintiff and his wife for the same amount of money that defendants had paid to purchase it. During the same conversation, Mr. Servin informed Mr. Roberts that an escrow had been opened at Stewart Title Company, a loan application had been submitted and it appeared the loan would be approved pending receipt of the appraisal. Mr. Servin attempted to

---

[5] At trial, Mrs. Roberts admitted she made some errors in filling out certain parts of the purchase option section of the contract. Notably, one provision in the lease-option agreement related to how the purchase price was to be paid if plaintiff exercised the option. In that provision, plaintiff was to deposit into escrow an executed promissory note for the entire balance of the purchase price, to be payable over two years to defendants at 12 percent interest. Mrs. Roberts testified at trial that that part of the lease-option agreement was filled out in error. She said there was no intention to take back a promissory note or to give plaintiff a loan to purchase the property. She stated: "He knew that he was not going to get another loan from us. He was to obtain this and purchase it, and he knew it."

[6] Mrs. Roberts did not know why, in filling in the blanks, she did not simply put that plaintiff could exercise the option between September 26, 2004, and October 26, 2004.

set up a meeting with Mr. Roberts to review and sign a written purchase agreement that the lenders would require for the transaction. Mr. Roberts responded that he and Mrs. Roberts were just leaving for Europe on a vacation that would last about one month and said "don't do anything until I get back."

Subsequently, an appraisal of the property was completed that showed a market value of $186,000. Additionally, sometime in October of 2004, Mr. Servin received word that a commercial lender had approved plaintiff's loan request and plaintiff was informed of this fact,[7] whereupon plaintiff made a deposit of approximately $10,000 into the escrow to cover anticipated lending fees and closing costs regarding the transaction.

After defendants returned from their vacation, plaintiff and Mr. Servin had a meeting with defendants at defendants' home to discuss the real estate purchase. Mr. Servin thought the meeting was in late September of 2004; Mr. Roberts was certain it was on October 23, 2004. At the meeting, Mr. Servin presented a standard form purchase agreement to defendants that Mr. Servin had prepared in order to satisfy the lender's requirements. The proposed purchase agreement was backdated to September 21, 2002, which Mr. Servin said was either a mistake or perhaps was due to his understanding of the parties' original agreement. The proposed purchase agreement reflected that a $7,500 deposit was received toward a total $140,000 purchase price, with a balance due to "seller" of $132,500. It further stated that "buyer" had to obtain financing by October 31, 2004, and would continue to pay rent in an unspecified amount until the purchase was completed.[8]

During the meeting, defendants excused themselves for a private conversation about the proposed purchase agreement. Mr. Roberts returned and told plaintiff and Mr. Servin that he would not sign the proposed purchase agreement at that time, but he would go to the title company to sign it. Defendants never asked plaintiff or Mr. Servin to make any changes or corrections to the proposed purchase agreement. Mr. Roberts did go to the title company the next day, but he never signed the proposed purchase agreement. In fact, he refused to do so. Plaintiff continued to call Mr. Roberts until October 26, 2004, demanding that Mr. Roberts sell the property to him, but Mr. Roberts simply told plaintiff he did not like the way the papers had

---

[7] Countrywide Financial Corporation turned down the loan application because they were not providing financing for mobilehome properties at that time, but according to Mr. Servin another lender did give verbal approval for a loan.

[8] Mr. Servin had also prepared another version of the proposed purchase agreement that was dated September 20, 2004, but this was not the one given to defendants.

been prepared. Mr. Roberts told plaintiff that he (plaintiff) had not fulfilled his obligations and that his "time was over"—he had lost his opportunity to purchase the property.

Sometime before defendants refused to sign the proposed purchase agreement, plaintiff told defendants that he had heard the property had appreciated and was worth $500,000. Mrs. Roberts thought at that time that plaintiff's estimate of $500,000 was perhaps a good one.

*Relevant Procedural History*

Plaintiff filed the present action against defendants on December 16, 2004. On December 14, 2005, plaintiff filed a third amended complaint alleging causes of action for, among other things, breach of oral contract, breach of implied covenant of good faith and fair dealing, and fraud.[9] The third amended complaint was the operative pleading at the time of trial on June 25, 2007. As with all prior versions of the complaint, the underlying contract was alleged to be an *oral* loan agreement. No written contract was alleged.

Defendants' responsive pleadings referred to the existence of the written lease-option agreement over two years prior to the commencement of trial. On March 30, 2005, defendants' answer to the second amended complaint expressly alleged the existence of a written contract as a defense to the oral agreement. In support of that defense, defendants attached a copy of the lease-option agreement to their answer. Later, in their answer to the third amended complaint, sometime after plaintiff's deposition testimony indicated his denial of the existence of a written agreement, defendants revised their defensive posture by simply asserting that there was "no valid or enforceable oral *or written* contract between [p]laintiff and [d]efendants." (Italics added.)

On February 7, 2007, plaintiff Johnny Garcia died. Plaintiff's wife was then substituted into the case to continue the litigation as plaintiff's successor in interest and personal representative.

Trial commenced on June 25, 2007. During discussion of several motions in limine, plaintiff's counsel announced his intention to move to amend the third amended complaint in order to allege a new cause of action for breach of *written* contract. Plaintiff's counsel proposed to add a claim against defendants based on the lease-option agreement entered on September 26,

---

[9] Plaintiff also alleged equitable claims, including for specific performance and rescission, but these were dismissed prior to trial.

2002. Defendants' counsel, while acknowledging that defendants were aware of the existence of the written contract, objected that it was prejudicial to allow plaintiff to make the proposed amendment during trial since plaintiff previously denied there was any agreement other than the alleged oral loan agreement and, in reliance on plaintiff's claims, defendants only prepared to defend the alleged oral agreement. The issue of whether plaintiff would be allowed to amend his complaint was then deferred until later in the trial proceedings.

Subsequently, plaintiff's counsel admitted to the trial court that plaintiff had previously known about the written contract but refused to allow plaintiff's counsel to refer to it in the lawsuit. Prior to closing arguments, plaintiff's motion to amend was formally presented along with a brief in support of the motion. The trial court heard extensive oral argument from both sides. Ultimately, the trial court granted the motion and plaintiff was permitted to file the proffered amendment to the third amended complaint adding a new cause of action for breach of written contract.

The jury found in favor of plaintiff on all causes of action. Specifically, plaintiff prevailed against both defendants on the causes of action for breach of written contract and breach of implied covenant of good faith and fair dealing. Plaintiff prevailed against Mr. Roberts on the breach of oral loan contract and fraud claims.[10] Damages of $366,973 were awarded to plaintiff. Judgment was entered in favor of plaintiff on August 13, 2007.

Defendants moved for JNOV and for new trial. The trial court granted a limited new trial on the issue of damages only, but otherwise denied the motions. Defendants' appeal followed.

## DISCUSSION

I. *Standard of Review**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Abuse of Discretion in Granting of Leave to Amend at Trial*

Defendants contend the trial court abused its discretion when it allowed an amendment to plaintiff's complaint during trial that constituted "the last-minute change of course to add a cause of action for breach of written

---

[10] Mrs. Roberts had previously been dismissed from the oral contract and fraud claims.

*See footnote, *ante*, page 900.

contract." Defendants objected to the proposed amendment based on prejudice. The trial court ultimately permitted the amendment to add a claim for breach of the written lease-option agreement since "it appears it conforms to the proof taken in this court."[11]

We begin our consideration of this issue with an overview of the relevant legal principles. It is well established that leave to amend a complaint is entrusted to the sound discretion of the trial court, and " ' "[t]he exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse." ' " (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242 [46 Cal.Rptr.3d 66, 138 P.3d 214].)

■ Code of Civil Procedure[12] section 473 gives trial courts discretion to allow a party to amend his or her pleadings "in furtherance of justice," while section 576 states that such leave to amend may be granted even after the commencement of trial. Section 469 specifically governs motions to amend at trial to conform to proof, which was the basis for the trial court's order in the present case. Section 469 provides in relevant part as follows: "No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits." Such amendments at trial to conform to proof, "if not prejudicial, are favored since their purpose is to do justice and avoid further useless litigation." (*Union Bank v. Wendland* (1976) 54 Cal.App.3d 393, 400 [126 Cal.Rptr. 549].)

As summarized by our Supreme Court in *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31 [69 Cal.Rptr. 568, 442 P.2d 648]: "[T]he allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused. [Citations.] Such amendments have been allowed with great liberality 'and no abuse of discretion is shown *unless by permitting the amendment new and substantially different issues are introduced in the case or the rights of the adverse party prejudiced* [citation].' (Italics added.) [Citations.]" Conversely, " 'amendments of pleadings to conform to the proofs should not be allowed when they raise new issues not included in the original pleadings and upon which the adverse party had no opportunity to defend. [Citations.]' [Citations.]" (*Ibid.*)

---

[11] At the time of the motion to amend, the lease-option agreement had been introduced as evidence by plaintiff's counsel, ostensibly for purposes other than to support the intention to amend the pleadings.

[12] Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

■ "The cases on amending pleadings during trial suggest trial courts should be guided by two general principles: (1) whether facts or legal theories are being changed and (2) whether the opposing party will be prejudiced by the proposed amendment. Frequently, each principle represents a different side of the same coin: If new facts are being alleged, prejudice may easily result because of the inability of the other party to investigate the validity of the factual allegations while engaged in trial or to call rebuttal witnesses. If the same set of facts supports merely a different theory—for example, an easement as opposed to a fee—no prejudice can result." (*City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1563 [255 Cal.Rptr. 682].) "The basic rule applicable to amendments to conform to proof is that the amended pleading must be based upon the same general set of facts as those upon which the cause of action or defense as originally pleaded was grounded." (*Union Bank v. Wendland, supra,* 54 Cal.App.3d at pp. 400–401.)

Defendants argue the trial court erred in granting leave to amend because the amendment caused *unfair prejudice.* Defendants claim such prejudice existed because plaintiff not only failed to previously allege the existence of any contract other than the oral loan agreement, but affirmatively represented in deposition testimony that the only agreement he had with defendants concerning the property was the oral loan agreement. Our review of plaintiff's deposition testimony presented in the trial court confirms that plaintiff repeatedly insisted at his deposition that there was only an oral loan agreement, and he expressly denied knowing anything about or entering a written lease-option agreement.

The following excerpt of plaintiff's deposition testimony is illustrative:

"Question: Do you recall entering into this agreement with Mr. and Mrs. Roberts?

"Answer: What kind of an agreement is [it]?

"Question: It is a lease with option to purchase. Do you recall entering into this agreement with Mr. and Mrs. Roberts?

"Answer: No. It was only a loan that I asked them for, that's all. [¶] . . . [¶]

"Question: Before today have you ever seen this agreement?

"Answer: No. I did not know that I had a [lease], or whatever you meant to say. I only know that I asked for a loan, that's all."

Elsewhere in the deposition, plaintiff was asked whether the oral loan agreement was "the only agreement [he] had with . . . defendants concerning the property," to which plaintiff responded "[y]es, that's all." He also expressly denied signing any written agreement concerning the property with defendants. After being shown the signature page on the lease-option agreement, he acknowledged that it "looks like my signature," so he believed it was possible that he signed it, but he had no recollection of ever doing so.

In support of their argument regarding prejudice, defendants further contend that as a result of plaintiff's deposition testimony and in reliance thereon, they did not pursue further discovery from plaintiff to defend a potential claim under the lease-option agreement, such as asking plaintiff at his deposition whether (or when) he ever gave notice in writing that he was exercising the option, what steps he took to comply with his obligations under the lease-option agreement, what specific terms (if any) were breached by defendants, and whether the written lease-option agreement was intended to replace the oral agreement.[13]

Additionally, defendants argue it was not in the furtherance of justice to allow the amendment at trial under the particular circumstances because it was demonstrated that plaintiff actually *knew* of the lease-option agreement but *refused* to allow his attorney to raise it in the litigation. It was only when plaintiff's wife took over the case after his death that the amendment was sought. In this regard, plaintiff's trial attorney, Mr. Littlewood, admitted to the trial court that his deceased client gave a "directive" to him that the written agreement was not to be raised in the lawsuit.[14] Mr. Littlewood conceded that he was "not permitted by [his] client to refer to that contract." As defendants put it in their new trial motion, these circumstances showed that "[plaintiff] intentionally refused to acknowledge the existence of the [lease-option agreement] until trial thereby depriving the [d]efendants of the opportunity to obtain discovery on that issue."

Plaintiff's attorney responds, as he did in the trial court, that plaintiff was not acting in bad faith but probably misunderstood or was confused regarding

---

[13] Since plaintiff apparently denied entering the lease-option agreement and denied knowledge of its terms, there was obviously no basis or foundation for asking plaintiff to explain the circumstances and object of that agreement, or the facts showing his performance of the requirements thereof and defendants' breach, or to specify whether he ever gave written notice to exercise the option.

[14] This directive by plaintiff was further reflected by the fact that defendants attached a copy of the lease-option agreement to their March 30, 2005 answer to the second amended complaint (more than two years prior to trial), but when plaintiff subsequently filed his third amended complaint on December 14, 2005, it still made no mention of the written agreement.

the facts or the import of the lease-option agreement. Plaintiff's attorney further suggests in the responsive brief that plaintiff may have clung to his belief that the substance of his agreement with defendants was an oral loan because he was illiterate (could not read English), unsophisticated, over 70 years old, and because the parties' prior business dealings had been carried out by oral agreements.[15]

Second, plaintiff denies there was prejudice because, while the amendment presented a new legal theory, it was based on the same general set of operative facts.

Defendants reply that of course they were aware of the lease-option agreement's *existence*, but since plaintiff had disavowed knowledge of it and claimed that the "only" agreement between the parties concerning the property was the oral loan agreement, the scope of the issues for which discovery was sought was significantly impacted. Additionally, defendants note there are substantial differences between the two types of contractual relationships being put forward, and a written lease with an option to purchase is plainly inconsistent with a mere oral loan. Therefore, defendants argue it is unreasonable to attempt to blend the two agreements and pretend the issues are the same under either agreement.

█ Having considered the above arguments in light of the record, we are persuaded that allowing the amendment at trial unfairly prejudiced defendants and therefore constituted an abuse of discretion. As recognized by the Court of Appeal in *Brautigam v. Brooks* (1964) 227 Cal.App.2d 547, 560 [38 Cal.Rptr. 784], if a proposed amendment during trial is prejudicial to the opposing party, it is reversible error to grant leave to amend to conform to proof. In that case, shortly before evidence was presented to the jury the defendant withdrew the issue of contributory negligence, which naturally affected the manner in which the plaintiff questioned the witnesses and elicited testimony during the trial. After the evidence was presented, the defendant changed his mind and moved to amend to assert the defense of contributory negligence with the understanding that both parties could introduce new evidence on that issue. The trial court granted the motion. On appeal, the order was reversed due to the prejudicial effect the amendment had on the manner evidence was presented at trial, inevitably leading to an undue emphasis on the issue of contributory negligence. (*Ibid.*) In so holding, the Court of Appeal quoted with approval language from prior decisions that

---

[15] It is not explained how plaintiff could have persisted in such allegedly innocent misunderstandings when he was represented by an attorney, Mr. Littlewood, during the entire litigation below.

our courts should not tolerate a party to " 'blow hot and cold in this manner' " (*ibid.*, and see cases collected therein) if it would prejudice his or her opponent.

■ Here, plaintiff's deposition testimony to the effect that there was *only* an oral loan agreement between the parties concerning the property, and that he had no knowledge of any agreement in the nature of a written lease option, reasonably limited the focus of defendants' discovery efforts and the manner in which defendants prepared for trial.[16] As defendants point out, a number of significant factual issues that specifically related to the lease-option agreement were not pursued in plaintiff's deposition or in other discovery, since it became unnecessary to do so in light of what plaintiff asserted under oath at his deposition. (See fn. 13, *ante.*) Indeed, since plaintiff denied knowledge of the lease-option agreement, the pursuit of discovery from plaintiff on that subject could reasonably go no further. Portions of plaintiff's deposition testimony, as necessarily limited in scope due to plaintiff's claimed lack of knowledge, were read to the jury at trial because of plaintiff's death.

In view of these circumstances *and* the crucial fact that at the time of trial plaintiff was deceased and so could not be questioned further on any issues relevant to the lease-option agreement, we conclude that defendants were unfairly prejudiced when the trial court permitted the amendment during trial and thereby allowed plaintiff (through his wife as successor in interest) to materially reverse his position by asserting a cause of action for breach of the lease-option agreement. Plaintiff, whom it turns out knew about the lease-option agreement but refused to allow his attorney to raise it, cannot be permitted through his successor in interest to " 'blow hot and cold in this manner' " to defendants' prejudice. (*Brautigam v. Brooks, supra*, 227 Cal.App.2d at p. 560.)[17] For these reasons, the trial court's order granting leave to amend is reversed.

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[16] Of course, the position plaintiff took at his deposition was entirely consistent with his pleadings in the case until trial, which alleged only a breach of oral loan agreement.

[17] In light of our conclusion that leave to amend was an abuse of discretion, it is unnecessary to consider defendants' additional arguments on this question, such as waiver, estoppel, and the alleged invalidity of an unverified amendment to a verified pleading.

*See footnote, *ante*, page 900.

## DISPOSITION

The trial court's order permitting plaintiff to allege a breach of written contract cause of action is reversed. Accordingly, that part of the judgment awarding damages to plaintiff on the cause of action for breach of written contract is vacated. In all other respects, the orders and judgment of the trial court are affirmed. Costs on appeal are awarded to plaintiff.

Levy, Acting P. J., and Hill, J., concurred.