Filed 11/14/14  Silvergate Financial v. Asbury CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SILVERGATE FINANCIAL, INC., | D062677 |
| Plaintiff, Cross-defendant and Appellant, | |
| v. | (Super. Ct. No. 37-2009-00064006-CU-BC-EC) |
| JAMES A. ASBURY et al., | |
| Defendants, Cross-complainants and Respondents; | ORDER MODIFYING OPINION, DENYING PETITION FOR REHEARING, AND DENYING REQUEST FOR JUDICIAL NOTICE |
| LOMA VERDE, INC., | |
| Cross-defendant and Appellant. | [**CHANGE IN JUDGMENT**] |

THE COURT:

It is ordered that the opinion filed herein on October 21, 2014, be modified as follows:

On page 29, the full paragraph under Disposition is deleted and replaced with the following paragraph:

The judgment is reversed. The trial court is directed to (1) order the Asburys to reconvey the Buck Property to Silvergate on terms necessary to restore the parties to the status quo ante, provided, however, that if the trial court finds it is impossible to order the reconveyance of the Buck Property due to the intervening rights of bona fide third parties, if any,[1] then the trial court is directed to exercise its equitable powers to restore the parties as closely as possible to the status quo ante with respect to the Buck Property; (2) enter judgment in Appellants' favor on the Asburys' cross-complaint; (3) conduct further proceedings to redetermine Silvergate's causes of action for breach of contract and quiet title in light of our conclusion that Silvergate is not estopped from enforcing the deadline in Paragraph No. 1.06(a) of the Exchange Agreement; and (4) redetermine who, if anyone, is the prevailing party for purposes of awarding costs in light of the trial court's redetermination of Silvergate's claims. Appellants are entitled to their costs on appeal.

The petition for rehearing is denied.

The request for judicial notice is denied.

**There is a change in the judgment.**

McCONNELL, P. J.

Copies to: All parties

---

[1] In determining the bona fides of any third party, the trial court is directed to consider principles such as alter ego and fraudulent transfer.

2

Filed 10/21/14  Silvergate Financial v. Asbury CA4/1 (unmodified version)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SILVERGATE FINANCIAL, INC., | D062677 |
| Plaintiff, Cross-defendant and Appellant, | |
| v. | (Super. Ct. No. 37-2009-00064006-CU-BC-EC) |
| JAMES A. ASBURY et al., | |
| Defendants, Cross-complainants and Respondents; | |
| LOMA VERDE, INC., | |
| Cross-defendant and Appellant. | |

APPEALS from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Reversed and remanded with directions.

Bryan C. Vess; Richard H. Benes for Plaintiff, Cross-defendants and Appellants.

Thorsnes Bartolotta McGuire, Vincent J. Bartolotta, Jr., Karen R. Frostrom; Niddrie Fish & Addams and Michael H. Fish for Defendants, Cross-complainants and Respondents.

James and Judith Asbury entered into a complex real estate exchange transaction with Silvergate Financial, Inc. (Silvergate).  When the deal fell apart due to delays in obtaining development entitlements from the County of San Diego (County), the parties sued one another to determine ownership of a disputed piece of property and for breach of contract (among other claims).

In a bifurcated bench trial, the court first tried the parties' equitable claims and found Silvergate was equitably estopped from enforcing certain contract deadlines and, as a result, determined the Asburys were the equitable owners of the disputed property. Months after the second phase of trial on the parties' legal claims, the Asburys moved for leave to amend their cross-complaint to conform to proof at trial by adding a claim for breach of a contract not alleged in the Asburys' trial-operative pleading and a related claim for breach of agency.  The trial court granted the Asburys' motion and entered judgment against Silvergate and its parent company, Loma Verde, Inc. (Loma Verde; collectively, Appellants).

Appellants appeal the judgment, contending (1) the trial court abused its discretion by allowing the Asburys to amend their cross-complaint; (2) insufficient evidence supports the judgment regarding ownership of the disputed property and breach of contract; (3) the trial court awarded excessive damages; and (4) the court erred by entering judgment against Loma Verde.

2

We agree the trial court abused its discretion in granting the Asburys leave to amend their cross-complaint so long after trial and in contradiction of their pretrial discovery responses. We also agree the judgment—when confined to the claims pleaded in the Asburys' trial-operative cross-complaint—is not supported by substantial evidence with respect to the Asburys' claims of equitable estoppel and breach of contract. Because we reverse the judgment based on these conclusions, we do not address Appellants' remaining challenges.

## FACTUAL BACKGROUND[1]

James and Judith Asbury, husband and wife, own 60 acres of land in Jamul, California (the Jamul Property). They also own two automotive businesses that operated on the Jamul Property.[2] The Jamul Property is adjacent to an upscale residential development.

---

[1] In accordance with the substantial evidence standard of review, we recite the facts established by the record viewed in the light most favorable to the judgment and resolving any conflicts in the evidence or inferences in support of the judgment. (*612 South LLC v. Laconic Limited Partnership* (2010) 184 Cal.App.4th 1270, 1276.) The Asburys contend Appellants have waived their substantial evidence challenge by failing to include all material facts in their opening brief. While we agree Appellants stated certain facts charitably to their position, we decline to deem Appellants' substantial evidence challenges forfeited.

[2] Except where context requires that we distinguish among them, we will refer generally to James, Judith, and their companies collectively as the Asburys. For the sake of clarity, we will refer to James and Judith by first name.

3

Loma Verde is a real estate developer and builder that operates under the fictitious business name Pacific Scene Homes (Pacific Scene).[3] Pacific Scene formed Silvergate to purchase real estate; Silvergate is not itself a developer or builder. Allen Eads is vice president and project manager of Pacific Scene and vice president of Silvergate.

James and Eads are related by marriage. During a family party in July 2003, Eads spoke with James about selling the Jamul Property to Pacific Scene. A few months later, the Asburys and their attorney, Dion Dyer, met with Eads and other Pacific Scene personnel to discuss a possible sale. Pacific Scene was only interested in acquiring the Jamul Property if it could be "entitled" for development of a substantial number of homes. Pacific Scene told the Asburys it expected to obtain entitlements within eight to ten months by piggybacking onto the existing adjacent residential development. Pacific Scene was willing to pay $6 million for the Jamul Property if it could be properly entitled. Because of income tax implications, the Asburys were interested in disposing of the Jamul Property via a tax-deferred exchange for other suitable property.

In February 2004, after consulting with engineers, Pacific Scene told the Asburys entitlements would take about one year. Pacific Scene anticipated closing the contemplated exchange by mid-2005.

James identified as a potential exchange property an industrial property owned by Buck Knives (Buck) in El Cajon, California (the Buck Property). Buck was in the process of relocating, but still needed the Buck Property until its new facility was

---

[3]     When discussing factual events, we will refer to this entity as Pacific Scene.

operational. In early May 2004, the Asburys and Buck entered into a 10-year lease for the Buck Property, with a sublease back to Buck for 10 months to facilitate the relocation. Buck granted the Asburys an option to purchase the Buck Property for $7.5 million, which the Asburys could assign to Silvergate.

On May 14, 2004, the Asburys and Silvergate entered into two key agreements (among others) designed to implement a potential tax-deferred exchange of the Jamul Property for the Buck Property. Under the first agreement titled "Put and Call Options For Exchange of Real Property" (Put/Call Agreement), Silvergate had an approximately two-year window in which it could exercise its "call" option, which would require the Asburys to assign to Silvergate their option to purchase the Buck Property. The agreement gave the Asburys an approximately two-year window (staggered about five months later than Silvergate's window) in which they could "put" the option to Silvergate, which would compel Silvergate to exercise the option to purchase the Buck Property. The Put/Call Agreement "authorize[d] and empower[ed]" Silvergate to immediately begin seeking development entitlements for the Jamul Property, which Silvergate "agree[d] . . . to diligently pursue . . . ." Pacific Scene is the entity that actually pursued the entitlement process.

If either the put or call option were exercised, the parties' second key agreement—the Exchange Agreement—would become effective. This agreement required the parties to exchange the Jamul Property for the Buck Property, so long as several conditions were satisfied. The most significant condition required that the County approve the Jamul Property for development with at least 32 residential building lots (the entitlement

5

condition). If this entitlement condition failed, the Exchange Agreement gave the Asburys two opportunities to acquire an ownership interest in the Buck Property: (1) under Paragraph No. 1.06(a), the Asburys had "[u]ntil September 30, 2005 (unless extended by mutual written agreement)" to compel Silvergate to sell the entire property to them; and (2) under Paragraph No. 1.06(b), either the Asburys or Silvergate had "[u]ntil December 31, 2005 (unless extended by mutual written agreement)" to insist the Asburys purchase a one-half interest in the property. Paragraph No. 1.06(c) provided that if neither of these options were exercised, "then [Silvergate] shall retain its interest in the Buck Property subject to the Lease . . . ." The Exchange Agreement, which provided that "[t]ime is of the essence," set March 1, 2007, as the outside closing date for the exchange unless the parties "in writing mutually . . . extend such time." In the meantime, the Exchange Agreement confirmed Silvergate as the Asburys' landlord at the Buck Property, with rent equal to the amount of Silvergate's mortgage payment and property taxes.

On November 17, 2004, Silvergate exercised its call option under the Put/Call Agreement and the Exchange Agreement became operative.

To finance the $7.5 million purchase of the Buck Property, Silvergate paid Buck $1.5 million and Buck and Silvergate obtained a $6 million loan from Americo Financial (Americo), which the ultimate owner of the Buck Property would assume. Americo's loan was divided into two notes secured by a single trust deed: (1) a long-term $3.2 million note (Loan A), and (2) a short-term $2.8 million note due in November 2006 (Loan B). Loan B's two-year term was chosen as twice the time Pacific Scene estimated it would need to entitle the Jamul Property. The Asburys expected to pay off Loan B

6

with the proceeds from the property exchange, leaving the Buck Property subject only to Loan A.[4] Americo required the Asburys to qualify for Loan A because they were expected to eventually own the Buck Property.

In April 2005, Silvergate closed escrow on its acquisition of the Buck Property. The Asburys identified subtenants for the Buck Property and spent approximately $1.3 million repairing Buck's damage to the property and making tenant improvements. The Asburys paid all the expenses associated with the Buck Property, which included mortgage payments on Loan A and Loan B, property taxes, insurance, utilities, maintenance, and tenant improvements. The Asburys also paid all expenses associated with the Jamul Property, except those related to efforts to obtain entitlements, which were Silvergate's obligation under the Put/Call Agreement.

In April 2005, Pacific Scene told the Asburys it was "well on [its] way to having approval of the development permits that [it] required, and those would be approved and expected them to be approved within a matter of months and expected it to be exchanged close to a matter of months."

On August 31, 2005, the Asburys and Silvergate modified the Buck Property lease to extend its 10-year term to 20 years.

As the September 30, 2005, deadline for compelling Silvergate to sell the Buck Property to the Asburys under Paragraph No. 1.06(a) of the Exchange Agreement

---

4    For purposes of the exchange, the parties valued the Jamul Property at $6 million and the Buck Property at $7.5 million. The parties would offset the difference in respective equities at close of escrow.

approached, the Asburys made no demand of Silvergate because Pacific Scene was continuing to process entitlements and told the Asburys multiple times it anticipated obtaining development approval and intended to close the exchange. And, in any event, the Asburys did not believe they were able to exercise their option to compel the sale because the entitlement condition had not yet failed—the County had not expressly disapproved the entitlement requests.[5]

By November 2005, the Asburys understood the entitlement applications were being expedited and Silvergate represented the County would issue approvals within months.

In December 2005, the Asburys met with Appellants for what the Asburys thought would be a preclosing meeting. Instead, Pacific Scene informed the Asburys it was over a year behind schedule and needed another one to two and a half years to complete the entitlement process. The delay concerned the Asburys for several reasons. First, because they anticipated the exchange to close by mid-2005, the Asburys had only budgeted to carry the mortgage payments on both the Jamul Property and Loan B on the Buck Property for approximately six months. Second, Loan B was coming due in November 2006 and would have to be refinanced. Third, the deadlines in the parties' agreements were or would be passing before the entitlements were obtained.

By the end of 2005, the parties orally agreed to extend all the dates. In May 2006, the Asburys sent Silvergate a proposed amended Exchange Agreement that documented

---

[5] The Asburys made clear they believed "failure" of the condition required an express disapproval by the County, not mere inaction.

8

the time extensions the parties had discussed. The new date for the Asburys' right to purchase the Buck Property upon failure of conditions was January 31, 2010. Silvergate told the Asburys it would sign an amended Exchange Agreement, but never did.

Regarding Loan B, Silvergate wanted to refinance not only to extend the loan term, but also to increase the loan amount by $1.5 million so Silvergate could recoup its initial investment in the Buck Property. Silvergate told the Asburys it intended to put the recouped funds toward obtaining entitlements for the Jamul Property. Before Americo would fund the additional $1.5 million, it required the Asburys to move one of their automotive businesses into the Buck Property, which the Asburys did at a cost of $750,000. The Asburys paid all the refinance costs. The Loan B refinance closed in June 2007, increasing the total debt on the Buck Property to approximately $7.6 million and recouping all of Silvergate's investment in that property. An appraisal conducted in connection with the refinance valued the Buck Property at approximately $14 million.

After the Loan B refinance closed, Pacific Scene "didn't process anything of any significance" on the Jamul Property. At a meeting in May 2008, Silvergate notified the Asburys it was terminating the exchange transaction and offered to help the Asburys find another developer to take over its position. Silvergate indicated then it did not want to end up with the Buck Property.

On June 17, 2008, Silvergate sent the Asburys a letter confirming it did not intend to continue pursuing entitlements for the Jamul Property. The letter stated Silvergate had concluded the conditions to the exchange had failed and, because the Asburys had not exercised their option to purchase the Buck Property, Silvergate "retains sole and

9

exclusive ownership of the Buck Property subject to the lease." Silvergate offered to sell the Buck Property to the Asburys for the existing $7.6 million in debt, plus an additional $1.4 million.

In August 2008, Eads called James and stated the County was interested in seeing the Jamul Property development go forward. Eads retracted Silvergate's position as stated in its June 17 letter that the exchange transaction was canceled.

On January 16, 2009, Pacific Scene sent the Asburys a letter stating, "As expressed to you in our letter of June 17, 2008, the date for the Exchange has passed and we have suspended our effort to continue entitle [*sic*] the Jamul Property pursuant to the Exchange Agreement." Without notice to the Asburys, Pacific Scene withdrew the Jamul Property development applications on file with the County. Because of an interim change in the County's general plan, the Jamul Property could now be entitled for only eight residential lots and the industrial zoning was lost. As a result, the Jamul Property was then worth only $2.1 million.

The Asburys had to refinance the Americo loan again, resulting in additional loan fees and interest.

On February 6, 2009, the Asburys demanded Silvergate either close the exchange or deliver a grant deed for the Buck Property. Silvergate did neither, and instead sued the Asburys.

### PROCEDURAL HISTORY

In February 2009, Silvergate sued the Asburys for breach of the Buck Property lease, quiet title, and declaratory relief. Silvergate's complaint attached both the Put/Call

10

and Exchange Agreements. Silvergate also filed an unlawful detainer action to evict the Asburys from the Buck Property for nonpayment of rent.

In March 2009, the Asburys answered and filed a cross-complaint, which they amended one year later, asserting claims for breach of the Exchange Agreement, fraud, declaratory and injunctive relief, and specific performance of the Exchange Agreement. In April 2009, the court issued a preliminary injunction maintaining the status quo.

The court bifurcated the trial, trying the equitable claims regarding ownership of the Buck Property in a Phase I bench trial in August 2010. On September 17, 2010, the trial court notified the parties by letter of its tentative decision finding the Asburys held equitable title to the Buck Property. On November 15, 2010, the court entered an interlocutory judgment that required Silvergate to deed the Buck Property to the Asburys and the Asburys to assume Silvergate's liability on the Buck Property loans. At a hearing on that date, Silvergate's Phase I trial lawyer, Mark Mazzarella, said he planned to record a notice of lis pendens. The Asburys' attorney said this would "definitely" cause a problem with the Asburys' ability to assume the Buck Property loans. The court warned Silvergate's attorney, "I understand you all have to represent your client, but, clearly, there could be consequences when you do that." Silvergate did not immediately record a notice of lis pendens.

On February 28, 2011, the court issued its statement of decision on Phase I. The trial court found the doctrines of equitable estoppel and laches precluded Silvergate from strictly enforcing the Exchange Agreement's deadlines for compelling Silvergate's sale or exchange of the Buck Property. The court also found Silvergate's abandonment of its

11

efforts to obtain entitlements constituted a waiver of the Exchange Agreement's entitlement condition.

The Asburys timely deposited in escrow proof of their ability to assume the Buck Property loans. Silvergate delayed in depositing documents required of it. On January 28, 2011, Silvergate recorded a notice of lis pendens, which "effectively killed the loan assumption and escrow transaction." Loan B was coming due again in June 2011, which, because of delays in closing escrow, would not afford the Asburys sufficient time to refinance.

On February 1, 2011, the court expunged the notice of lis pendens. The trial court stated it was "astonished" by Silvergate's conduct and noted, "for appellate review," it was "shocked at what [Silvergate] did." If Silvergate had not interfered with the close of escrow, the Asburys' loan assumption agreement with the lender would have released Silvergate's obligations on the Americo loans.

On March 10, 2011, the trial court entered an order modifying the interlocutory judgment as follows:

> "The failure of the escrow to close pursuant to the Interlocutory Judgment is primarily due to Plaintiff's and Cross-defendant's dilatory actions, due to their violations of the terms and intent of the Interlocutory Judgment, and due to their abandonment of the loan assumption provided for in . . . the Interlocutory Judgment. [¶] . . . [¶] 1. The Asburys are excused from the obligations . . . of the Interlocutory Judgment to assume Silvergate's liability for Americo's approximate $7.6 million loan, or to assume liability for

12

any related obligations or guarantees of Silvergate, secured by or related to the Buck Property."[6]

A civil jury trial for Phase II was originally set for June 3, 2011. In April, however, the Asburys requested a continuance. They were attempting to refinance the Americo loans to prevent Americo from foreclosing on the Buck Property after Loan B came due and wanted the financing situation resolved before trial to solidify their damages. Appellants agreed to a continuance on the condition "that nothing else happen . . . to upset the status of the case, such as the addition of causes of action, theories of recovery, factual patterns, parties. That would be unacceptable." The court stated any "major change . . . would have to be decided by the court." The court asked, "the pleadings are set[,] aren't they"? Appellants' counsel responded, "one would think." The Asburys' counsel stated she did not know of any reason to change the pleadings, but added, "not knowing what I don't know, I need to reserve all my rights." The court granted the continuance, noting in its order that "no other 'actions' are to be added[] [a]s further detailed in the court reporter's notes."

Both parties waived jury and the court tried Phase II over several days in November 2011. On January 30, 2012, the trial court issued a tentative decision finding in favor of the Asburys on their and Silvergate's breach of contract claims. The court found in Appellants' favor on the Asburys' fraud claims.

---

6    This belies Silvergate's assertion in its opening brief that the trial court amended the Interlocutory Judgment "because the lenders on the Buck Property . . . would not consent to the Asbury[s'] assumption of the loans on that property."

13

Appellants requested a statement of decision and the trial court directed the Asburys to prepare one. Appellants objected to several drafts prepared by the Asburys, including on the basis that the Asburys' trial-operative cross-complaint did not support the decision and the "Asburys made no effort to amend their complaint to conform to proof during the trial . . . ." Appellants' grievance in this regard challenged the proposed decision's finding of a breach of the Put/Call Agreement when the Asburys had only sued for breach of the Exchange Agreement. In June 2012, the Asburys filed a motion to amend their first amended cross-complaint to conform to proof at trial by adding to their existing breach of contract claim allegations that Appellants also breached the Put/Call Agreement and by adding a new cause of action for breach of agency. Over Appellants' opposition, the court granted the Asburys' motion.

On August 30, 2012, the court filed its statement of decision on Phase II and entered final judgment. The judgment awards the Asburys (1) specific performance, i.e., ownership of the Buck Property, plus $1,441,422 in incidental damages; (2) $3,966,000 in damages "related to the Jamul Property" for breach of contract; (3) $5,407,422 in damages for breach of agency; (4) $283,172.29 in trial costs; and (5) $1,485,650.41 in attorney fees. Adjusting for overlap in the damages awarded for the specific performance, breach of contract, and breach of agency theories, the total amount awarded against Appellants, jointly and severally, is $7,176,244.60.

Appellants timely appealed.

14

I.

Appellants contend the trial court abused its discretion by granting the Asburys leave to amend their cross-complaint to conform to proof at trial. Appellants contend they were misled and prejudiced by the belated amendment because it contradicted the Asburys' trial-operative pleading and discovery responses, thereby depriving Appellants the opportunity to adequately prepare for trial. We agree.

A.    *Guiding Legal Principles*

"Code of Civil Procedure section 473 gives trial courts discretion to allow a party to amend his or her pleadings 'in furtherance of justice,' while section 576 states that such leave to amend may be granted even after the commencement of trial." (*Garcia v. Roberts* (2009) 173 Cal.App.4th 900, 909 (*Garcia*).) Code of Civil Procedure section 469 specifically governs motions to amend at trial to conform to proof, and provides in relevant part as follows: "No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits."

"[T]he allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused. [Citations.] Such amendments have been allowed with great liberality 'and no abuse of discretion is shown *unless by permitting the amendment new and substantially different issues are introduced in the case or the rights of the adverse party prejudiced* [citation].' (Italics added.)" (*Trafton v.*

15

*Youngblood* (1968) 69 Cal.2d 17, 31; *Garcia*, *supra*, 173 Cal.App.4th at p. 909.)

Conversely, " ' "amendments of pleadings to conform to the proofs should not be allowed when they raise new issues not included in the original pleadings and upon which the adverse party had no opportunity to defend. [Citations.]" ' " (*Ibid.*)

"[I]n ruling on a motion to amend a complaint to conform to proof, 'the court is usually guided by whether: [¶] . . . there is a *reasonable excuse* for the delay . . . ; [¶] . . . the change relates to the *facts* or only to legal theories; and [¶] . . . the opposing party will be *prejudiced* by the amendment.' " (*Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1378-1379 (*Duchrow*).) Whether facts or legal theories are being changed and whether the opposing party will suffer prejudice "represent[] a different side of the same coin: If new facts are being alleged, prejudice may easily result because of the inability of the other party to investigate the validity of the factual allegations while engaged in trial or to call rebuttal witnesses. If the same set of facts supports merely a different theory -- for example, an easement as opposed to a fee -- no prejudice can result." (*City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1563.)

B.      *Analysis*

        1.      *Delay*

        The Asburys filed their original cross-complaint in March 2009. They filed a first amended cross-complaint in March 2010. Phase I of the trial was conducted in August 2010, and Phase II was conducted in November 2011. The trial court announced its tentative decision in Phase II in January 2012. Yet, the Asburys did not seek leave to amend to conform to proof until *five months later*, in June 2012. They offer this court no

16

explanation for their delay other than to argue it did not result in any prejudice. Their only excuse to the trial court was that they "brought their motion within weeks of receiving specific objections from [Appellants] as to the proposed statement of decision . . . ." However, the Asburys had all of the necessary information to allege a claim for breach of the Put/Call Agreement before they filed their cross-complaint in 2009—not to mention their first amended cross-complaint a year later. (*Duchrow*, *supra*, 215 Cal.App.4th at p. 1380.) Their three-year delay in seeking to do so was unwarranted. (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1345 [" ' " 'even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial.' " ' "].)

2. *Whether The Amendment Changed Factual or Legal Theories*

" 'The basic rule applicable to amendments to conform to proof is that the amended pleading must be based upon the same general set of facts as those upon which the cause of action or defense as originally pleaded was grounded.' " (*Garcia*, *supra*, 173 Cal.App.4th at p. 910.) The Asburys' amendment violated this rule. Their amended claim for breach of contract alleged a different, *additional* contract (the Put/Call Agreement) than the one they originally sued under (the Exchange Agreement). It also alleged different conduct. The Asburys' first amended cross-complaint alleged Appellants breached the Exchange Agreement by repudiating it in June 2008 and February 2009. Their posttrial amended cross-complaint alleged a breach of the Put/Call

17

Agreement beginning in 2007 by failing to diligently seek entitlements.[7] The Asburys'

new sixth cause of action for breach of agency alleged a duty arising from the Put/Call

Agreement and a breach of that duty premised essentially on the same conduct on which

the Asburys alleged a breach of that agreement.

The Asburys' briefing inadvertently concedes the material difference between their

original claim and their amended ones. In arguing the trial court did not award double

recovery on their claims for breach of the Exchange Agreement and breach of the

Put/Call Agreement, the Asburys' brief argues the claims vindicated different primary

rights involving "*different property* (Jamul, not Buck), a *different provision in the*

*documents* (Paragraph [No.] 1.04(b) of the Put/Call, not [No.] 1.06(a) of the Exchange),

and a *different act of breach* (withdrawing applications)." The Asburys cannot have their

cake and eat it too.

The Asburys nonetheless argue the trial court had discretion to allow an

amendment that alleged breach of a different contract. The cases they cite in support,

however, are all distinguishable.[8] In *Crown Products Co. v. California Food Products*

*Corp.* (1947) 77 Cal.App.2d 543, the appellate court concluded an amendment to

---

[7]    The Asburys initially sought leave to allege a lack of diligence dating as far back as 2005, but were reminded they had stipulated Appellants diligently pursued entitlements through June 2007. The Asburys conceded the issue and the court granted leave to amend only as to conduct after June 2007.

[8]    The Asburys also cite cases for the proposition that an amendment to conform to proof may allow a new legal theory. We do not address those cases because the Asburys' amendment was not limited to merely adding a new theory, but was also based on different facts.

18

conform to proof "did not plead an entirely different cause of action from that originally pleaded" because "the 1943 contract was not an entirely new, distinct and different contract from the 1941 contract" in that "[t]he 1943 contract, at most, simply modified several terms of the 1941 contract." (*Id*. at p. 549.) Moreover, there was no prejudice because "all facts relating to both contracts [were] fully inquired into" at trial. (*Id*. at p. 548.)

In *Beab, Inc. v. First Western Bank & Tr. Co.* (1962) 204 Cal.App.2d 680, the new theory of liability was disclosed several weeks before trial, the motion to amend was made before termination of the trial, and the court allowed the defendants leave to reopen to offer evidence on the new issues. (*Id.* at p. 684.)

In *General Credit Corp. v. Pichel* (1975) 44 Cal.App.3d 844, the defendant was on notice at least three weeks before trial that plaintiff intended to pursue liability based on a subsequent acknowledgment of an underlying debt rather than on the original contract. (*Id*. at p. 847.) Thus, the defendant "had knowledge of what would be produced at trial in sufficient time to offer any defense he could to the proof produced." (*Id*. at p. 850.)

Finally, *Higgins v. Del Faro* (1981) 123 Cal.App.3d 558 is distinguishable because the plaintiff sought leave to amend her complaint before trial and involved only the "technical" correction of the plaintiff's mistaken attachment of escrow instructions to the complaint instead of attaching the underlying purchase agreement. (*Id*. at pp. 565, 561.)

19

3. *Prejudice*

Since we have concluded the Asburys' amendment was based on new factual predicates, Appellants can more easily establish prejudice. (*City of Stanton v. Cox*, *supra*, 207 Cal.App.3d at p. 1563.) Appellants' contention they were prejudiced by the posttrial amendment because they were misled in their trial preparation by the Asburys' then-operative cross-complaint and discovery responses meets that burden.

Appellants' Phase II trial counsel, Brian Vess, filed a declaration in opposition to the Asburys' motion for leave to amend in which he stated he "did not prepare for trial any issues relating to breaches of the Put and Call Agreement or issues of alleged breaches of agency." Vess explained: "The reasons for this are (1) my reliance on the allegations of the Asburys' operative pleading, their First Amended Cross[-]Complaint (which did not allege a breach of the Put and Call Agreement or of agency), (2) my reliance on the Asburys' interrogatory responses (which did not evidence a breach of the Put and Call Agreement or of agency), and (3) my reliance on the deposition testimony given in the case, (which, again, did not evidence a breach of the Put and Call Agreement or of agency)."

The Asburys' interrogatory responses, which were attached to Vess's declaration, are revealing. Appellants propounded form interrogatory No. 50.1 to the Asburys, which asked: "For each agreement alleged in the pleadings: [¶] (a) identify each [document] that is a part of the agreement . . . ." The Asburys responded: "(a) Exchange Agreement." They did not identify the Put/Call Agreement. Appellants also propounded form interrogatory No. 50.2, which asked: "Was there a breach of any agreement alleged

20

in the pleadings? If so, for each breach describe and give the date of every act or omission that you claim is the breach of the agreement." The Asburys responded: "Yes. Silvergate repudiated the agreement in June 2008 and January 2009." In light of their response to the prior interrogatory, the Asburys could only have been referring to the Exchange Agreement.

In addition, Appellants stipulated to the Asburys' request for a continuance of the Phase II trial on the condition "that nothing else happen in the case to upset the status of the case, such as the addition of causes of action, theories of recovery, factual patterns, parties. That would be unacceptable."

Consistent with the Asburys' operative pleading and interrogatory responses, Appellants made clear in their Phase II opening statement that they understood the Asburys' contract claim was exclusively for breach of the Exchange Agreement: "In terms of their claim of breach of contract, they are claiming the breach of the same contract that we are, the Exchange Agreement. . . . They claim one contract was breached." Appellants' opening statement further indicated their understanding of the Asburys' theory of breach of the Exchange Agreement: "[V]ery importantly the Asburys claim two specific, and only two specific, breaches of that agreement, breaches that occurred in years four and five of the agreement. Those are the only claimed breaches." Appellants were referring to their 2008 and 2009 repudiation letters.

Appellants' Phase II closing argument confirmed that their understanding of the Asburys' contract claim had not changed during trial: "They sued for the breach of a single agreement. We hear all the razzle dazzle about put and call, obligations that are

21

imposed there and all this other extraneous material, but they sued only for damages for breach of one contract:  the Exchange Agreement."

Under similar circumstances, appellate courts have reversed orders allowing belated amendments to conform to proof.  For example, in *Garcia* the plaintiff sued for breach of an oral loan agreement, but sought leave to amend during trial to allege breach of a written contract.  The defendant argued he would be prejudiced by the amendment because the new claim contradicted the plaintiff's deposition testimony.  (*Garcia, supra*, 173 Cal.App.4th at p. 908.)  The trial court allowed the amendment, and the jury returned a verdict in the plaintiff's favor.  (*Ibid*.)  The Court of Appeal reversed, finding it was a prejudicial abuse of discretion to allow the plaintiff to pursue a theory that contradicted deposition testimony that made it unnecessary to conduct pretrial discovery on the new theory.  (*Id*. at p. 913.)  Although the court also found it "crucial" that the plaintiff had died before trial and thus could not be examined regarding the new theory (*ibid*.), the Asburys' five-month posttrial delay here in moving for leave to amend similarly deprived Appellants the opportunity to examine the Asburys at trial on their new theory.

In *Duchrow*, the Court of Appeal held the trial court abused its discretion by allowing a mid-trial amendment to conform to proof in an action brought by an attorney against his former client for breach of their retainer agreement after the attorney withdrew from representation.  The original complaint alleged a breach of one paragraph of the parties' agreement that established a combined hourly and contingent fee arrangement.  (*Duchrow, supra*, 215 Cal.App.4th at p. 1364.)  The plaintiff sought approximately $44,000 in damages under this theory.  (*Id*. at p. 1370.)  On the fourth day

22

of a five-day trial, he sought leave to amend to allege a breach of a different paragraph of the agreement that entitled him to recover " '*for all time spent*' " on the matter if his withdrawal was for cause. (*Id*. at p. 1366.) He sought damages of more than $300,000 under this theory. (*Id*. at p. 1373.) The trial court allowed the amendment, and the jury returned a verdict in the plaintiff's favor awarding over $140,000 in damages. (*Id*. at pp. 1375-1376.) The Court of Appeal reversed.

After noting the motion was made "unreasonably late and without a reasonable excuse for the delay" (*Duchrow, supra*, 215 Cal.App.4th at p. 1380), the court explained the mid-trial amendment prejudiced the defendant because it increased the amount of damages sought and deprived her of the opportunity to conduct discovery, to obtain an expert witness, to meaningfully consider previous settlement offers, to retain counsel for trial, and to research the questionable legal validity of the plaintiff's new theory. (*Id*. at pp. 1381-1382.) The Asburys' posttrial amendment similarly increased Appellants' exposure and deprived Appellants of the opportunity to conduct discovery or to examine the Asburys at trial regarding their new claim.

The Asburys contend Appellants were not prejudiced by the posttrial amendment because they knew the Put/Call Agreement was at issue—after all, Appellants alleged it in, and attached it to, their own complaint. However, Appellants' acknowledgment that the Put/Call Agreement was relevant to the parties' dispute is insufficient to put Appellants on notice that the Asburys would seek affirmative relief from Appellants under that agreement. Indeed, the *Duchrow* court found prejudice when the plaintiff

23

sought to assert a claim based on a different paragraph of the same contract he had already sued on. (*Duchrow*, *supra*, 215 Cal.App.4th at pp. 1381-1382.)

The Asburys also contend Appellants suffered no prejudice because they had ample opportunity to—and *did*—present evidence regarding their diligent pursuit of entitlements. It is true that Appellants' own employee (Eads), land use attorney, and expert testified during Phase I regarding the efforts Appellants undertook to entitle the Jamul Property and Appellants' diligence in doing so. But that was in the context of equitable ownership of the Buck Property, not liability for breach of the unpleaded Put/Call Agreement. As the Asburys' counsel acknowledged during her Phase I closing argument, "This isn't a case about who is to blame. This is a case in equity about who has title to this property."

In that respect, the Asburys tied Appellants' diligence to the ownership issue by contending Paragraph No. 1.06(c) of the Exchange Agreement—which confirmed Silvergate as the owner of the Buck Property *if the entitlement condition failed*—only applied if Appellants diligently and in good faith pursued the entitlements. Nevertheless, the Asburys sought to limit Appellants' introduction of evidence of their diligence. During Appellants' opening statement, the Asburys objected that evidence regarding diligence was irrelevant: "[A]ll of this stuff that we are going to sit through is related to whether or not they were -- were duly diligent in trying to get entitlements, which, again, has nothing to do with the issue at hand. Nothing." During Appellants' cross-examination of the Asburys' attorney, Dion Dyer, the Asburys proposed and Appellants accepted a stipulation that "Pacific Scene worked diligently toward entitlements until

24

June [20]07."  Based on that stipulation, Appellants cut short their cross-examination of Dyer.  The Asburys later used the stipulation in an attempt to exclude testimony regarding the development process, even though Appellants explained the testimony did not relate to diligence but, rather, was providing context and related to the Asburys' reliance on alleged misrepresentations.

Under these circumstances, we conclude it was an abuse of discretion to allow the posttrial amendment of the operative cross-complaint to allege new claims based on breach of the Put/Call Agreement and breach of the agency relationship allegedly created by it.  In light of this conclusion, we address below only those issues that relate to the Asburys' originally pleaded claim for breach of the Exchange Agreement.

## II.

Appellants challenge (among other things) the sufficiency of the evidence supporting the judgment's award of specific performance of the Exchange Agreement's purchase option based on the trial court's finding Appellants were equitably estopped from enforcing the agreement's deadlines.  By focusing on the relevant timeframe—the period before the September 30, 2005, deadline for the Asburys' exercise of their purchase option—it is apparent that insufficient evidence supports the equitable estoppel finding on which the judgment is based.

"The doctrine of equitable estoppel is founded on concepts of equity and fair dealing.  It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment."  (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725;

25

Evid. Code, § 623.) "A valid claim for equitable estoppel requires: (a) a representation or concealment of material facts; (b) made with knowledge, actual or virtual, of the facts; (c) to a party ignorant, actually and permissibly, of the truth; (d) with the intention, actual or virtual, that the ignorant party act on it; and (e) that party was induced to act on it." (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 584.) "There can be no estoppel if one of these elements is missing." (*Ibid.*) "[T]he existence of an estoppel is generally a question of fact for the trier of fact, and ordinarily the trial court's determination is binding on appeal unless the contrary conclusion is the only one to be reasonably drawn from the facts." (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 266.)

Although the parties appear to quibble over the issue, they ultimately agree the judgment awarded specific performance of the Exchange Agreement's purchase option, Paragraph No. 1.06(a). That provision imposes two conditions on the Asburys' right to purchase the Buck Property from Silvergate. First, the provision applies only "[i]f the condition for the exchange of properties described in paragraph 3.03(2) hereof"—the so-called entitlement condition—"fails." Second, the Asburys had only "[u]ntil September 30, 2005 (unless extended by mutual written agreement)" to exercise the purchase option. The evidence on which the Asburys rely to support their equitable estoppel claim negates that claim.

First, and most fundamentally, the purchase option had not ripened by the September 30, 2005, deadline because the entitlement condition had not yet failed.[9] This deficiency in the Asburys' claim is illustrated by attorney Dyer's two-fold explanation of why "September 30th, 2005, came and went without the Asburys making a demand" under Paragraph No. 1.06(a):

> "A.  Because Pacific Scene was continuing to process entitlements and had told us multiple times in that period of a few months there, right up through the meeting with the County in November that they anticipated obtaining development approval and intended to close the exchange.
>
> "Q.  And up to that point in time -- go back to the beginning of the sentence.
>
> "A.  There is potentially another problem as well.
>
> "Q.  And what is that?
>
> "A.  That is that there had been no failure of condition . . . . [¶] . . . [¶]
>
> "Q.  Now, with respect to [No.] 1.06, the very beginning says, 'If the condition for the exchange of properties described in [No.] 3.03(2) hereof fails, after such failure the following occurs,' correct?  So here's my question to you:  [¶] As of September 30th, [20]05, had there been a failure?
>
> "A.  No.  [¶] . . . [¶] No.  The answer is no.  They were still processing.
>
> "Q.  As of that date September 30, 2005, had Silvergate either been approved or disapproved yet by the County?

_____

9 As noted *ante* footnote 5, the Asburys maintain the entitlement condition fails only when the County expressly disapproves the proposed project.  It is undisputed that had not happened by September 30, 2005.

27

"A.  They were still processing.  No approval or disapproval had been received.

"Q.  As a result of that fact and what was represented to them, did the Asburys exercise their right to demand Buck be transferred to them on September 30th, 2005?

"A.  There had been no disapproval. . . ."

The Asburys' brief quotes Dyer's first answer above, but omits the remainder of the exchange regarding the failure condition.  It is the remainder, however, that is dispositive of the Asburys' equitable estoppel claim.  Under the Asburys' theory of the case—both at trial and on appeal—the Asburys could not have relied on Appellants' representations in refraining from exercising Paragraph No. 1.06(a)'s purchase option because *the Asburys' themselves contend they did not yet have the right to exercise it*.

Dyer further testified the parties first discussed extending the September 30, 2005, deadline on December 12, 2005.  Because the September 30 deadline had passed by then, the Asburys could not have relied on Appellants' December statements in refraining from exercising the purchase option in September.  The absence of detrimental reliance is fatal to the Asburys' equitable estoppel claim.  (*Simmons v. Ghaderi*, *supra*, 44 Cal.4th at p. 584.)

Additionally, the Asburys could not have reasonably relied on Appellants' statements that they were "continuing to process entitlements" because those statements only served to further confirm the failure condition had not yet occurred and would not occur before the purchase option expired.  And because the parties stipulated "Pacific

28

Scene worked diligently toward entitlements until June [20]07," the Asburys cannot fault Appellants for not satisfying the failure condition by the September 30, 2005, deadline.

We do not intend to suggest Appellants' conduct in December 2005 and beyond—such as representing they would amend the Exchange Agreement to extend all dates and obtaining a cash-out refinance on the basis of a proposed, unexecuted amendment—could not have equitably estopped Appellants from enforcing the Exchange Agreement's other subsequent deadlines, namely the March 1, 2007, deadline for "[c]lose of escrow for the exchange of properties."   However, as the Asburys acknowledge, "[b]ecause the trial court did not specifically enforce the exchange; but rather, specifically enforced the Asbury[s'] right to purchase Buck under Paragraph [No.] 1.06(a), the March 2007 deadline for close of escrow is a non-issue."  When examining Appellants' conduct prior to the expiration of the Asburys' September 30, 2005, deadline for exercising their purchase option, the only conclusion "to be reasonably drawn from the facts" (*Albers v. County of Los Angeles*, *supra*, 62 Cal.2d at p. 266) is that the equitable estoppel on which the judgment for breach of the Exchange Agreement is based is not supported by substantial evidence.

Because we will reverse the judgment based on the conclusions we have already reached, we need not address Appellants' remaining challenges to the judgment.

DISPOSITION

The judgment is reversed.  The trial court is directed to (1) order the Asburys to reconvey the Buck Property to Silvergate on terms necessary to restore the parties to the status quo *ante*; (2) enter judgment in Appellants' favor on the Asburys' cross-complaint;

29

(3) conduct further proceedings to redetermine Silvergate's causes of action for breach of contract and quiet title in light of our conclusion that Silvergate is not estopped from enforcing the deadline in Paragraph No. 1.06(a) of the Exchange Agreement; and

(4) redetermine who, if anyone, is the prevailing party for purposes of awarding costs in light of the trial court's redetermination of Silvergate's claims.  Appellants are entitled to their costs on appeal.

McCONNELL, P. J.

WE CONCUR:


BENKE, J.


McDONALD, J.

30