Filed 8/25/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LNSU #1, LLC, et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ALTA DEL MAR COASTAL COLLECTION COMMUNITY ASSOCIATION, <br><br> Defendant and Respondent. | D080208, D081204 <br><br><br> (Super. Ct. No. 37-2018-00032291-CU-MC-CTL) |

APPEALS from a judgment and postjudgment orders of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Judgment affirmed; postjudgment orders reversed.

James E. Friedhofer; Knottnerus & Associates, Wilfred Knottnerus and Mark B. Simpkins for Plaintiffs and Appellants.

Gordon & Rees, Craig J. Mariam, John B. Fraher, and Scott W. McCaskill for Defendant and Respondent.

Appellants LNSU #1 and LNSU #2, two homeowners in a common interest development managed by the Alta Del Mar Coastal Collection Community Association (the Association), appeal the judgment entered

against them in their action against the Association for violations of the Common Interest Development Open Meeting Act (OMA; Civ. Code, § 4900 et seq.; subsequent undesignated section references are to this code).  After a bench trial, the court rejected appellants' claims that the Association violated the OMA when its board of directors took action in an executive session that it should have taken in a meeting open to all members, the board failed to prepare minutes concerning a second executive session, and certain directors discussed items of Association business via e-mails without giving all Association members notice and opportunity to participate in the discussions and without preparing related minutes.  We affirm the judgment.

Appellants also appeal postjudgment orders denying their motion to strike or tax costs and granting the Association's motion for attorney fees. The trial court awarded costs under a provision of the OMA authorizing such an award to a prevailing homeowners association in an action the court finds "to be frivolous, unreasonable, or without foundation" (§ 4955, subd. (b)).  The court awarded attorney fees under a provision of the Davis-Stirling Common Interest Development Act (Davis-Stirling Act; § 4000 et seq.) applicable to an action to enforce the governing documents of a homeowners association (§ 5975, subd. (c)).  We conclude the Association is not entitled to attorney fees or costs, and reverse the challenged orders.

## I.
## BACKGROUND

### A. *Parties*

The Association is the governing body of a common interest development in San Diego County that includes 10 homes.  At most times pertinent to this appeal, the Association had a board of five directors,

2

including Martin Mueller, Richard Pyke, Ponani Sukumar, Anthony Valeri, and Douglas Woelkers.

Appellants LNSU #1 and LNSU #2 are limited liability companies each of which owns a home in the Association. Sukumar is a manager of both entities. Sukumar sometimes sent Douglas Grimes as a proxy to attend Association board meetings. Grimes at some point became a manager of LNSU #2 and was elected to the Association's board in June 2017.

B.    *E-mails Among Directors*

From August 2016 through March 2017, Mueller, Pyke, Valeri, and Woelkers exchanged multiple e-mails concerning Association business. Several examples are summarized below.

- On August 23, 2016, Valeri sent Mueller, Pyke, and Woelkers e-mails proposing items for the agenda for a board meeting on August 25, describing appellants' plans to construct 10,000 square feet of underground living space on their lots, and suggesting imposition of a fine if the plans were not submitted to the board. Mueller responded with a question about another lot approximately 30 minutes later.

- On August 26, 2016, Pyke responded to Valeri's August 23 e-mails by asking, "Any reaction to our HOA meeting yesterday?" In a separate e-mail, Woelkers responded that he "sense[d] we are heading towards an acrimonious relationship with [Sukumar]" and would need to take "some kind of punitive action just to uphold the precedent of the rules of the [Association]."

- On October 11, 2016, Mueller sent Pyke, Valeri, and Woelkers an e-mail about the landscaping plans for appellants' lots to state his position appellants should not be granted an extension of time to submit their plans and agreed to a board meeting to address the issues.

- On October 11, 2016, Valeri sent Mueller, Pyke, and Woelkers an e-mail concerning a hearing and potential imposition of a fine on another homeowner for violating the Association's landscaping guidelines. Woelkers responded the following day to urge consistency in application of the rules regarding hearings and fines to all homeowners.
- On January 30, 2017, Valeri sent Pyke, Mueller, and Woelkers an e-mail stating he had removed an item from the agenda for the February 1 board meeting and how he would "like to get [Grimes] out of everyone's hair." Mueller responded the following day that he could not attend the meeting.
- On February 5, 2017, Valeri forwarded Mueller, Pyke, and Woelkers an e-mail he had received from Grimes accusing him (Valeri) of violating the Association's governing documents and complaining of delays in approval of appellants' landscaping plans. The following day, Pyke responded, "Blah blah blah!"; and Mueller responded, "We need to get rid of Douglas Grimes. He is not part of our community."
- On March 3, 2017, Valeri sent Mueller, Pyke, and Woelkers an e-mail about whether to have a hearing on appellants' landscaping plans and whether to levy a fine. Valeri stated he would be having a call with an attorney on "how to handle this situation over the longer term." Ten minutes later, Pyke responded, "I think maybe we let the fines slide since [appellants have] submitted plans."

C. *E-mails from Sukumar and Grimes*

During the same period that Mueller, Pyke, Valeri, and Woelkers were exchanging e-mails with one another, Sukumar and Grimes sent the directors many e-mails about Association business. Some examples follow.

4

- On September 26, 2016, Grimes sent all directors and two other individuals an e-mail to offer a meeting to discuss appellants' landscaping plans without other members of the Association present.
- On October 18, 2016, Grimes sent all directors an e-mail asking them to vote that the requirement of notice to neighbors of appellants' landscaping plans had been satisfied.
- On November 16 and 17, 2016, Grimes and Sukumar exchanged e-mails about the draft of an e-mail concerning board approval of appellants' landscaping plans, which Grimes later sent to the directors.
- On February 5, 2017, Grimes sent all directors an e-mail accusing Valeri, in his capacity as president of the Association, of having acted "contrary to the spirit and letter of the [Association's] governing documents" and "interfered with Sukumar's efforts to landscape [appellants' lots] in complete accordance with the Design Guidelines."
- On February 19, 2017, Sukumar sent all other directors and Grimes an e-mail stating that, subject to two conditions, he approved Woelkers's application to the board to replace a brow ditch with a buried pipe.
- On February 24, 2017, Sukumar sent all other directors, Grimes, and two other individuals an e-mail complaining of delays in approval of appellants' landscaping plans and requesting a board hearing be postponed and held at a neutral location.
- On March 5, 2017, Sukumar sent all other directors, Grimes, and another individual an e-mail responding to modifications requested by Woelkers to the landscaping plans appellants had submitted.
- On March 10, 2017, Sukumar sent all other directors, Grimes, and two other individuals an e-mail concerning the scheduling of a board meeting to discuss appellants' landscaping plans.

5

- On March 29, 2017, Sukumar sent all other directors and his attorney an e-mail complaining of the board's failures to produce documents he had requested and requesting items be put on the agenda for an upcoming board meeting.

D.    *April 3, 2017 Board Meeting*

The board met in executive session on April 3, 2017.  Sukumar and all other directors except Mueller attended.  They discussed appellants' landscaping plans and voted 3-0 (Sukumar recused himself) to adopt the recommendations of the design review consultant to reject portions of the plans concerning driveway gates and walls.  The directors voted 3-1 (Sukumar was in the minority) to retain legal counsel.

E.    *Prior Litigation*

On July 17, 2017, appellants filed a complaint against the Association and its inspector of elections, Therese McLaughlin, to challenge the election of three directors held on June 22, 2017.  Appellants alleged that although Grimes had received the third highest number of votes and was eligible to serve on the board because he was a manager of LNSU #2, McLaughlin erroneously determined Grimes was ineligible.  While the action was pending, two of the three newly elected directors resigned, and McLaughlin reversed her position and decided Grimes had been validly elected to the board.  Sukumar, who was still a director, and Grimes held a board meeting on October 17, 2017, from which Valeri, who was also still a director, was absent.  At that meeting, Sukumar and Grimes appointed Girish Prasad, a manager of appellants, to the board.  The newly constituted board later voted to oust Valeri as president of the Association, to install Grimes as president and chief financial officer, to install Sukumar as vice-president and secretary, and to look for replacement legal counsel.  The trial court enjoined Prasad

6

from serving on the board and stayed the board's actions concerning appointment of officers and retention of new counsel. On appellants' appeal, this court affirmed those orders. (*LNSU #1 v. McLaughlin* (Dec. 20, 2018, D073366) [nonpub. opn.].)

F.      *August 28, 2017 Board Meeting*

On August 28, 2017, while the prior action was pending, the board met in executive session to discuss the litigation. No minutes were prepared for the meeting.

G.      *Current Litigation*

1.      *Pleadings*

Appellants commenced the present action against the Association on June 28, 2018, by filing a complaint alleging violations of the OMA. Specifically, appellants alleged the Association violated the OMA by conducting board meetings and taking action on Association business via e-mails without providing all homeowners notices and agendas in advance of the meetings, without allowing all homeowners to participate, and without making minutes available to homeowners. (See §§ 4910, subd. (a), 4920, subds. (a), (d), 4925, 4930, subd. (a), 4950, subd. (a).) Appellants further alleged the board held executive sessions on matters that should have been the subject of meetings open to all members, and did not note the general nature of the matters discussed in the executive sessions in the minutes of the next board meeting that was open to all homeowners. (See § 4935, subds. (a), (e).) Appellants sought a declaration that the Association had violated the OMA, an injunction requiring compliance, civil penalties, costs, and attorney fees. (See § 4955.)

The Association answered the complaint with a general denial and many affirmative defenses. As its 17th affirmative defense, the Association

alleged "all the claims against [it] are barred, in whole or in part, by the doctrine of unclean hands."

    2.    *Pretrial Proceedings*

In discovery, the Association provided a response to appellants' request for admissions that Valeri verified. The Association admitted directors had exchanged e-mails on matters of Association business and the exchanges violated several provisions of the OMA. In response to a request asking the Association to admit it had no facts to support its affirmative defense of unclean hands, the Association responded with certain objections and then stated: "Admit that [the Association] does not contend that the allegations regarding the [OMA] violations identified in [appellants'] Supplemental Response to Special Interrogatories, Set One as [the Association] understands them are barred by the doctrine of unclean hands. Otherwise denied. Discovery and investigation are ongoing."

The Association filed a motion for summary judgment or, in the alternative, summary adjudication on the grounds there was no actual controversy that would warrant declaratory relief, because the Association did not contest that at most 10 OMA violations had occurred; there was no need for injunctive relief, because the latest violation alleged by appellants had occurred more than two years earlier and there was no evidence of continuing violations; and the court could determine the number of violations and set the amount of civil penalties, if any. The court ruled appellants had not met their burden to establish the threat of future harm, summarily adjudicated the cause of action for injunctive relief against them, and otherwise denied the motion.

8

3. *Trial*

The case proceeded to a bench trial on appellants' claims for declaratory relief and civil penalties. In a joint trial readiness report, the parties identified as the legal issues in dispute: (1) whether the e-mails identified by appellants constituted OMA violations; (2) the number of OMA violations each e-mail constituted; (3) whether the two executive sessions identified by appellants violated the OMA; (4) the number of OMA violations that each executive session constituted; and (5) the number and amount of statutory penalties, if any, to which appellants were entitled.

In their trial brief, appellants argued the e-mails the directors had exchanged concerning appellants' landscaping plans and other Association business violated the OMA because no notices or agendas for the meetings were given to all members of the Association, not all members were allowed to attend and to speak at the meetings, and no minutes were prepared for the meetings. They argued the April 3, 2017 executive session of the board violated the OMA because the board took action on landscaping plans it should have considered in a meeting open to all members, and the August 28, 2017 executive session violated the OMA because the board prepared no minutes describing what was discussed in the session. Appellants also argued the Association's defense of unclean hands was groundless because they were given no notice of what the allegedly unclean acts were or who allegedly committed them. Appellants asked the trial court to assess 638 civil penalties of $500 each and to award them costs and attorney fees.

In its trial brief, the Association conceded the e-mails were sent but contended the directors did not know at the time they sent them that they could be violating the OMA, and argued that because appellants' managers (Sukumar and Grimes) had sent similar e-mails during the same period,

9

appellants were "inequitably seek[ing] relief against the Association for the exact same conduct they engaged in." The Association stated the April 3, 2017 board meeting "arguably" violated the OMA, because the board discussed appellants' landscaping plans in an executive session rather than in a meeting open to all members, but pointed out Sukumar and Grimes attended the meeting and were allowed to participate. The Association conceded the failure to prepare minutes for the August 28, 2017 executive session violated the OMA, but argued appellants should not be rewarded because it was their unlawful attempt to take over the board (which was the subject of the prior action) that prevented the preparation of minutes. The Association urged the trial court to deny appellants' claims for relief.

On the first day of trial, the court granted the Association's unopposed request to take judicial notice of the record in the prior action arising out of the June 22, 2017 election of directors to the Association's board. The court then heard opening statements from counsel and testimony from Woelkers. Valeri, Grimes, and Sukumar testified the following day. In overruling an objection to a question asking Sukumar whether certain e-mails violated the OMA, the court stated "it's going to be up to the [c]ourt what constitutes a meeting" under the statute. The court admitted the e-mails described in parts I.B. and I.C., *ante*, and other documents. The trial court denied appellants' motion to strike all evidence regarding the Association's affirmative defense of unclean hands. After the close of evidence, the court asked counsel, "Is there any law on whether an e-mail constitutes a meeting?" Counsel agreed it was a novel issue on which the court would be making new law.

On the third and final day of trial, the court heard closing arguments from counsel. During appellants' argument, the court asked counsel whether

10

certain e-mail exchanges were board meetings within the meaning of the OMA. Appellants' counsel answered the exchanges were meetings if the directors discussed "specifics" or offered an "opinion" about a proposed board action, but not if they discussed putting a matter on the agenda or scheduling a meeting. In its closing argument, the Association argued the exchanges were not board meetings within the meaning of the OMA, because the directors were not in the same place at the same time when they exchanged the e-mails and took no action on Association business in them.

After hearing closing arguments, the trial court ordered the parties to submit proposed statements of decision for its review. In their statement, appellants proposed that the court conclude the e-mail exchanges among directors constituted meetings under the OMA and cited statutory and case law purportedly supporting that conclusion. The Association proposed in its statement that the trial court reach the opposite conclusion and cited statutes, cases, and legislative history purportedly supporting that conclusion.

4.      *Trial Court's Decision and Judgment*

After issuing a tentative decision in favor of the Association and considering appellants' objections thereto, the trial court issued a final statement of decision that largely adopted the Association's proposed statement. The court ruled the April 3, 2017 executive session of the board substantially complied with the OMA because appellants' representatives (Sukumar and Grimes) participated in the session. The court ruled appellants' unclean hands in unlawfully attempting to take over the board caused the failure of the preparation of minutes generally noting what had been discussed at the executive session held on August 28, 2017, and barred appellants from obtaining relief for that failure. The court ruled the e-mail

11

exchanges among directors of which appellants complained were not board meetings under the OMA, and appellants' unclean hands in sending similar e-mails to directors barred them from obtaining any relief based on the exchanges. The trial court entered a judgment that appellants take nothing from the Association.

### 5. *Postjudgment Motions*

#### a. *Appellants' Motion to Strike or Tax Costs*

The Association filed a memorandum of costs totaling $8,874.61 for filing and motion fees; deposition costs; service of process fees; court reporter fees; models, enlargements, and photocopies of exhibits; electronic filing or service fees; and other costs. Attached to the memorandum were invoices and receipts for the various claimed costs.

Appellants filed a motion to strike or tax costs. They argued the Association could not recover any costs, because the provision governing costs in actions under the OMA allows a homeowners association to recover costs against a homeowner only if the court finds the action "to be frivolous, unreasonable, or without foundation" (§ 4955, subd. (b)), and their action did not fit that description. Appellants also argued the court reporter fees ($1,960.00) were not recoverable, because the parties had agreed to share those costs; and the "[o]ther" costs ($735.18) were insufficiently documented.

In opposition to appellants' motion, the Association argued that as the prevailing party it was entitled to recover costs. The Association claimed it was entitled to costs as "the prevailing party" "[i]n an action to enforce [its] governing documents" (§ 5975, subd. (c)), because appellants alleged in their complaint that they had made requests under the Association's governing documents, those requests underlay their claims for relief, and they recovered nothing in the action. The Association also claimed it was entitled to costs

because appellants' action was "unreasonable" and "without foundation" (§ 4955, subd. (b)) in light of their unclean hands in sending e-mails of the type they alleged violated the OMA and their steadfast resistance to the Association's efforts to end the litigation, as evidenced by their rejection of a settlement offer,[1] opposition to the motion for summary judgment in which the Association conceded 10 OMA violations, and changing position on how many OMA violations occurred.  Based on appellants' failure to accept the settlement offer, the Association argued it was entitled to recover its postoffer costs.  (See Code Civ. Proc., § 998, subd. (c)(1).)  The Association finally contended the court reporter fees it had claimed were allowable as costs, and the "other" costs it had claimed were for fees for virtual hearings held during the COVID-19 pandemic.

In reply, appellants argued the statute governing costs was section 4955, subdivision (b), not section 5975, subdivision (c), because their action was to enforce the OMA, not the Association's governing documents. Appellants further argued the Association could recover no costs, because the action was not frivolous.  They also argued the unavailability of costs under

---

[1]     On October 10, 2019, the Association offered, "[i]n full settlement, release and dismissal of the Complaint . . . , including the settlement of all claims asserted or that could have been asserted by [appellants] in relation to the allegations of the Complaint," to pay appellants $25,000.01 and their "reasonable attorney's fees and taxable costs" incurred in the action up to the date of the offer.  The offer stated it was an offer to compromise under Code of Civil Procedure section 998 and was "subject to the terms and conditions" of the statute.  Under the statute, "[i]f an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment . . . , the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer."  (Code Civ. Proc., § 998, subd. (c)(1).)  Such costs include attorney fees when authorized by contract or statute.  (*Id.*, § 1033.5, subd. (a)(10).)  Appellants allowed the Association's offer to lapse.

section 4955, subdivision (b) rendered the cost-shifting provisions of Code of Civil Procedure section 998 inapplicable.

### b. *Association's Motion for Attorney Fees*

The Association moved for an award of $409,282.50 in attorney fees. It sought fees under the same statutes and for the same reasons as it sought costs.

Appellants opposed the motion. They argued the controlling statute was section 4955, subdivision (b), which they claimed under no circumstances authorizes an award of attorney fees to a prevailing homeowners association in a homeowner's action for violation of the OMA. Appellants also argued the amount of fees the Association had requested was unreasonable.

In reply, the Association repeated and expanded on points it had made in its initial motion papers, and argued the fees it had requested were reasonably incurred.

### c. *Trial Court's Orders*

The trial court denied appellants' motion to strike or tax costs. It ruled that section 4955, subdivision (b) authorized the Association's recovery of costs, because appellants' "pursuit of litigation was unreasonable at multiple stages . . . . Among other reasons, [appellants] pursued the litigation despite unclean hands and rejected a reasonable settlement offer." The court awarded all claimed costs.

The trial court granted the Association's motion for attorney fees in part. It ruled fees were recoverable under section 5975, subdivision (c), because the Association had prevailed in an action in which "the complaint asserted requests under [the Association's] governing documents" and "sought to enforce [the] governing documents." The court further ruled that "although not necessary for an award of fees under . . . section 5975(c), the

14

court has already found that [appellants'] litigation was unreasonable. [Citation.] Accordingly, [the Association] is entitled to its reasonable fees from the date of its [Code of Civil Procedure s]ection 998 offer." After consulting with the parties and considering the record, the trial court awarded the Association $348,306 in attorney fees.

The trial court amended the judgment to add the awards of attorney fees and costs.

## II.

## DISCUSSION

A.    *Appeal of Judgment*

Appellants attack the judgment on several grounds. They contend the trial court erred by interpreting "board meeting" as used in the OMA not to include the e-mail exchanges among directors, and the Association's failure to assert that interpretation before trial precluded its assertion after trial under principles of waiver or judicial estoppel. Appellants argue that undisputed facts showed the Association violated the OMA by considering their landscaping plans at the April 3, 2017 executive session, rather than at a meeting open to all homeowners, and by failing to note what was discussed at the August 28, 2017 executive session in the minutes of the next board meeting open to all homeowners. Appellants contend the defense of unclean hands does not bar their claims for OMA violations based on the directors' e-mail exchanges. They ask us to reverse the judgment and to remand the matter for a new trial.

1.    *Appealability and Standard of Review*

The trial court's judgment finally disposed of the parties' dispute and is appealable. (Code Civ. Proc., § 904.1, subd. (a)(1); *UAP-Columbus JV 326132 v. Nesbitt* (1991) 234 Cal.App.3d 1028, 1034-1035.) On appeal from a

15

judgment based on a statement of decision after a bench trial, we review questions of law de novo and the trial court's findings of fact for substantial evidence. (*Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 791-792; *Aljabban v. Fontana Indoor Swap Meet, Inc.* (2020) 54 Cal.App.5th 482, 496.)

2.     *OMA Violations Based on Board's Executive Sessions*

We first address appellants' claims of error regarding the two executive sessions of the Association's board. The OMA limits the matters a homeowners association board may consider in an executive session to "litigation, matters relating to the formation of contracts with third parties, member discipline, personnel matters, or to meet with a member, upon the member's request, regarding the member's payment of [past-due] assessments." (§ 4935, subd. (a).) "Any matter discussed in executive session shall be generally noted in the minutes of the immediately following meeting that is open to the entire membership." (*Id.*, subd. (e).) Appellants contend undisputed facts showed the Association violated these statutes by discussing their landscaping plans at the April 3, 2017 executive session and by failing to prepare the required minutes concerning the topics discussed at the August 28, 2017 executive session. We conclude appellants forfeited these claims of error.

In their opening brief, appellants expend little effort on discussing the April 3, 2017 executive session. The pertinent portion of the statement of facts describes matters the board discussed and voted on, and states Sukumar and Grimes attended but Grimes was not allowed to speak. As purported record support, appellants cite a trial exhibit ("TE 21, pp. 1-23") that is not included in their appendices. In the corresponding portion of the legal argument, appellants say the trial court "appeared to conclude" the

16

Association violated the OMA by discussing appellants' landscaping plans in an executive session rather than in a meeting open to all members, and then go on to argue "the [c]ourt was prohibited from excusing the violation under the facts of the case" as "a mere 'technical error' or [']immaterial omission' " because other homeowners were excluded and Grimes was not allowed to speak. This portion of the brief contains no citation to the record or legal authority and no reference to the substantial compliance doctrine on which the trial court relied in its statement of decision to conclude there was no OMA violation.

Such a factually and legally unsupported claim of error does not satisfy appellants' burden on appeal. We presume the trial court's judgment is correct, and to overcome that presumption appellants must affirmatively establish prejudicial error by providing an adequate record, citing to the record, and presenting a persuasive argument with citations to supportive legal authorities. (Cal. Rules of Court, rule 8.204(a)(1)(B), (C); *Jameson v. Desta* (2018) 5 Cal.5th 594, 609; *Lee v. Kim* (2019) 41 Cal.App.5th 705, 721 (*Lee*); *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) It is not our role as an appellate court independently to review the record for error and to construct arguments for appellants that would require reversal of the judgment. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 (*Benach*).) Rather, where, as here, the appellants' opening brief makes contentions unsupported by proper record citations or cogent legal arguments, we may treat the contentions as forfeited. (E.g., *County of Sacramento v. Singh* (2021) 65 Cal.App.5th 858, 861; *Lee*, at p. 721.) Although in their reply brief appellants discussed the substantial compliance doctrine on which the trial court based its ruling and cited one

17

case concerning the doctrine, that discussion comes too late. An appellant may not put off to its reply brief the presentation of a legal argument supporting a claim of error asserted in its opening brief, for to do so would unfairly deprive the respondent of the ability to rebut the argument. (*Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1065, fn. 3 (*Bitner*); *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277-278.) We thus conclude appellants forfeited their claim of error concerning the April 3, 2017 executive session. (*Bitner*, at pp. 1065-1066; *Benach*, at p. 852 & fn. 10.)

We reach the same conclusion on appellants' claim of error regarding the August 28, 2017 executive session. In their opening brief, appellants barely discuss that session in the statement of facts or the legal argument. Appellants quote the meeting agenda and as purported support cite a trial exhibit ("TE 102") that is not in their appendices. In the legal argument, appellants contend a new trial should be granted because undisputed evidence established the board's secretary was tasked with preparing the minutes, and no evidence showed any of their managers ever lawfully held that position. Appellants do not reference the trial court's ruling that the required minutes for the August 28, 2017 executive session were not prepared because of their unlawful attempt to take over the board and that their resultant unclean hands barred their claim that the Association's failure to prepare the minutes violated the OMA. Appellants cite the statute they alleged was violated, but no other legal authority. They do not explain why, as a factual or legal matter, the conduct on which the trial court relied does not bar their claim. Appellants expand on their argument in their reply brief, but still cite no legal authority to support their contentions. This claim of error has thus been forfeited. (*Bitner*, *supra*, 87 Cal.App.5th at pp. 1065-

18

1066 & fn. 3; *Lee*, *supra*, 41 Cal.App.5th at p. 721; *Benach*, *supra*, 149 Cal.App.4th at p. 852 & fn. 10.)

### 3. *OMA Violations Based on Directors' E-mail Exchanges*

We next consider appellants' claim that the trial court erred by concluding the directors' e-mail exchanges did not constitute board meetings within the meaning of the OMA. Appellants contend a series of e-mails among directors on a matter of Association business, such as those of which they complain, fits within the definition of "board meeting" in section 4090, subdivision (a), and the Association should be barred from asserting a contrary position because it did not do so until after the close of evidence at trial. We are not persuaded.

#### a. *Waiver or Estoppel*

We first address appellants' contention that the Association's litigation conduct bars it from arguing the directors' e-mail exchanges were not board meetings within the meaning of the OMA. Appellants correctly point out that in a verified response to their request for admissions, the Association admitted the e-mails violated several provisions of the OMA, and in its summary judgment motion, the Association did not contest some of the e-mails constituted board meetings that violated the OMA. (See pt. I.G.2., *ante*.) Appellants also correctly point out that not until closing arguments did the Association contend the e-mails did not meet the statutory definition of a board meeting. (See pt. I.G.3., *ante*.) A "litigant cannot be permitted to blow hot and cold in this manner" if "[s]uch a strategy subjects the opposing party to unwarranted surprise" (*A & M Records, Inc. v. Heilman* (1977) 75 Cal.App.3d 554, 566) or "would prejudice his or her opponent" (*Garcia v. Roberts* (2009) 173 Cal.App.4th 900, 913).

19

Here, however, the Association's change of position did not unfairly surprise or prejudice appellants. They could not rely on any admissions the Association had made in the summary judgment motion, because such admissions were only for the purpose of the motion and did not estop the Association, as the unsuccessful moving party on the claims for declaratory relief and civil penalties, from taking a contrary position at trial. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 747-749; see *Filtzer v. Ernst* (2022) 79 Cal.App.5th 579, 587 [judicial estoppel requires party to be estopped to have successfully asserted position it later abandoned].) Nor could appellants rely on the Association's response to their request for admissions. During trial, the court considered whether to allow appellants to put on evidence of OMA violations not identified in discovery and the Association to put on evidence of unclean hands not disclosed in discovery. Appellants suggested the court either "allow everybody to put in whatever they want at this time, regardless of what the responses were before," or "exclude both." The court ruled the parties would not be bound by their discovery responses and "allow[ed] all that evidence to come in." Having invited and benefited from that ruling, appellants may not now seek to hold the Association to its discovery responses. (See § 3521 ["He who takes the benefit must bear the burden."]; *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685 [party forfeits right to attack on appeal procedure it agreed to at trial].)

Moreover, the record shows appellants were aware before and during trial that the key legal issue to be decided by the court was whether the e-mail exchanges of which they complained constituted board meetings under the OMA. In their *joint* trial readiness report, the parties identified as the first legal issue in dispute, "Whether the Emails identified by plaintiffs

20

constitute OMA violations." During trial, the court told the parties "it's going to be up to the [c]ourt what constitutes a meeting" under the statute. The parties presented their competing views on the issue orally during closing arguments and in writing in their proposed statements of decision. The court was not bound by the Association's earlier concessions that the e-mails constituted meetings under the OMA. "No litigant, of course, can effectively 'abandon' the correct reading of a statute; [the court] must independently determine the best interpretation . . . regardless of what the parties argue." (*Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1230; see Evid. Code, § 310, subd. (a) [court must decide all questions of law, including construction of statute]; *County of Madera v. Superior Court* (1974) 39 Cal.App.3d 665, 668 ["proper interpretation of statutory language is a question of law for the court"].)

Because the issue of whether the directors' e-mail exchanges constituted board meetings under the OMA was a legal one for the court to decide, appellants' complaint that the Association's change of position at the end of trial prejudicially prevented them from obtaining and presenting pertinent evidence lacks merit. Specifically, appellants claim that "[h]ad [the Association's] switch of argument taken place earlier, [they] could have cross-examined both Valeri and Woelkers on the involved directors' understandings and motivations at the time." Such matters, however, are irrelevant to the question of statutory interpretation the trial court had to decide. (See Evid. Code, § 310, subd. (a) [construction of statute is question of law for court]; *City of Rocklin v. Legacy Family Adventures-Rocklin, LLC* (2022) 86 Cal.App.5th 713, 728 ["It is the role of the judge to decide purely legal issues."]; *Maia v. Security Lumber & Concrete Co.* (1958) 160 Cal.App.2d 16, 21 [witness's understanding of statute is inadmissible because "[c]ourts are

bound by the statute, not by individual opinions of its interpretation"].) Appellants also claim the issue of whether an e-mail exchange constitutes a board meeting under the OMA may depend on factors that are in part factual (e.g., whether the e-mails functioned as in-person meetings, or whether directors had continuous access to e-mails and the ability to reply in a reasonable time), and they could have explored such factors more fully in discovery and at trial had they known earlier the Association was contesting the issue. Such exploration was unnecessary, because the trial court admitted into evidence all the e-mail exchanges appellants claimed violated the OMA and therefore had the information it needed to decide whether they constituted board meetings within the meaning of the OMA. (See, e.g., *Estate of Madison* (1945) 26 Cal.2d 453, 456 ["The construction of a statute and its applicability to a given situation are matters of law to be determined by the court."]; accord, *In re Marriage of Martin* (2019) 32 Cal.App.5th 1195, 1199.)

b.      *Whether E-mail Exchanges Were Board Meetings*

We now turn to the dispositive question of statutory interpretation: Were the directors' e-mail exchanges that appellants claim violated the OMA "board meetings" under the statute? We review the trial court's interpretation of the statute de novo. (*Segal v. ASICS America Corp.* (2022) 12 Cal.5th 651, 658; *Royals v. Lu* (2022) 81 Cal.App.5th 328, 344.) We begin by examining the language of the statute, giving that language its usual and ordinary meaning and adopting a construction that is consistent with the apparent legislative intent. (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1232-1233; *Yu v. Superior Court* (2020) 56 Cal.App.5th 636, 644.)

The OMA is part of the Davis-Stirling Act, which defines "board meeting" as "either of the following:

22

"(a)  A congregation, at the same time and place, of a sufficient number of directors to establish a quorum of the board, to hear, discuss, or deliberate upon any item of business that is within the authority of the board.

"(b)  A teleconference, where a sufficient number of directors to establish a quorum of the board, in different locations, are connected by electronic means, through audio or video, or both.  A teleconference meeting shall be conducted in a manner that protects the rights of members of the association and otherwise complies with the requirements of this act.  Except for a meeting that will be held solely in executive session or conducted under Section 5450 [which pertains to meetings during a state of disaster or emergency], the notice of the teleconference meeting shall identify at least one physical location so that members of the association may attend, and at least one director or a person designated by the board shall be present at that location. Participation by directors in a teleconference meeting constitutes presence at that meeting as long as all directors participating are able to hear one another, as well as members of the association speaking on matters before the board."  (§ 4090.)

The Davis-Stirling Act defines "board" as "the board of directors of the association" (§ 4085) and "item of business" as "any action within the authority of the board, except those actions that the board has validly delegated to any other person or persons, managing agent, officer of the association, or committee of the board comprising less than a quorum of the board" (§ 4155).

Appellants rely *solely* on subdivision (a) of section 4090 for their claim that the directors' e-mail exchanges constituted board meetings that violated

23

the OMA. They contend "[t]he usual and ordinary meaning of the phrase 'congregation, at the same time and place' encompasses a 'virtual' assembly by means of email," because, they say, e-mail allows all directors to communicate with one another simultaneously on items of board business in the same place, namely, cyberspace. We reject this construction of the statutory language as inconsistent with its usual and ordinary meaning.

To determine the usual and ordinary meanings of words used in a statute, courts consider the dictionary definitions of those words. (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122; *Turo Inc. v. Superior Court* (2022) 80 Cal.App.5th 517, 521.) We have consulted three dictionaries available at the time the Legislature enacted the OMA to determine the meaning of the phrase "congregation, at the same time and place." (§ 4090, subd. (a), as enacted by Stats. 2012, ch. 180, § 2.) Two define "congregation" as "an assembly of persons : GATHERING." (Webster's 3d New Internat. Dict. (2002), p. 478; Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 262.) An "assembly" is defined as "a company of persons collected together in one place usu. for some common purpose (as deliberation and legislation, worship, or entertainment)" (Webster's, p. 131), and a "gathering" as "a coming together of people in a group (as for social, religious, or political purposes)" (*id.*, p. 940). A third dictionary defines "congregation" similarly as "a gathered or assembled body; assemblage" (Random House Unabridged Dict. (2d ed. 1987) p. 430), and "assemblage" as "a group of persons . . . gathered" (*id.*, p. 125). That dictionary defines "place" as "a space, area, or spot, set apart or used for a particular purpose: *a place of worship; a place of entertainment.*" (*Id.*, p. 1478.) The other two define "place" as "a building or locality used for a special purpose," and offer as examples "<~ of

24

amusement>," "<~ of worship>," "<a ~ of learning>," and "<a fine eating ~>."
(Webster's, p. 1727; Merriam-Webster's, p. 946.)

From these definitions and examples, we conclude a "board meeting,"
as defined by section 4090, subdivision (a), means a gathering of a quorum of
the directors of a board of a homeowners association at the same time and in
the same physical location for the purpose of transacting any matter of
association business that is within the board's purview. By using the word
"congregation," the Legislature intended the directors come together for a
common purpose. By specifying the congregation be "at the same time and
place," the Legislature intended the directors simultaneously come together
in one location so that they can "hear, discuss, or deliberate upon any item of
business that is within the authority of the board." (*Ibid.*) Although the
definitions of "congregation" in the dictionaries cited in the preceding
paragraph say nothing explicit about physical location, the examples in those
dictionaries ordinarily involve gatherings of persons in one location for a
particular purpose—for deliberation and legislation (e.g., the U.S. Capitol),
for religious worship (e.g., a church or temple), or for social engagement or
entertainment (e.g., a night club or theater). Every example of a "place" in
those dictionaries is a physical location—a building, a place of worship (e.g., a
church or temple), a place of amusement or entertainment (e.g., a theater or
stadium), a place of education (e.g., an elementary school or college), or a fine
eating place (a café or restaurant). We think it is clear from the words chosen
that in enacting section 4090, subdivision (a) the Legislature had in mind the
traditional board meeting of a homeowners association, i.e., one where the
directors gather in the same room with homeowners to talk about and to act
on matters of association business. Hence, by sending e-mails to one another
through cyberspace, often hours or days apart and from different homes and

25

offices, the Association's directors did not simultaneously gather in one location to transact board business, and therefore they did not conduct a "board meeting" within the meaning of section 4090, subdivision (a).[2]

In urging us to construe section 4090, subdivision (a) to include e-mail exchanges among the directors of a board of a homeowners association on matters of association business, appellants argue that "[l]egally, a '[b]oard [m]eeting' under [the] OMA is capable of being conducted via electronic transmissions." We agree a board meeting conducted by electronic means is permitted by the OMA, but not by virtue of section 4090, subdivision (a). Subdivision (b) of section 4090 defines "board meeting" as "[a] teleconference, where a sufficient number of directors to establish a quorum of the board, in different locations, are connected by electronic means, through audio or video, or both." In this type of meeting, "[p]articipation by directors . . . constitutes presence at that meeting as long as all directors participating are able to hear one another, as well as members of the association speaking on matters before the board." (*Ibid.*) The e-mail exchanges at issue in this case do not qualify as such a board meeting, however, because they did not allow the participating directors "to hear one another." (*Ibid.*) In any event, appellants have expressly disavowed reliance on section 4090, subdivision (b).

Appellants also rely on section 4910, subdivision (b) as support for their contention that a series of e-mails among directors can satisfy the "same time and place" requirement of section 4090, subdivision (a). Section 4910,

---

[2] If, as appellants contend, cyberspace qualifies as a "place" within the meaning of section 4090, subdivision (a), because the directors "met" there "to exchange ideas and opinions on [Association] items of business" by sending e-mails to one another, it is unclear how the Association could have discharged its obligation under the OMA to "give notice of the time and place of a board meeting at least four days before the meeting." (§ 4920, subd. (a).) Appellants provide no answer in their briefs.

26

subdivision (b) prohibits the board from conducting a board meeting "via a series of electronic transmissions, including, but not limited to, electronic mail," except "as a method of conducting an emergency board meeting" to which all directors consent in writing. An emergency board meeting may be called "if there are circumstances that could not have been reasonably foreseen which require immediate attention and possible action by the board, and which of necessity make it impracticable to provide notice" four days before the meeting. (§ 4923; see § 4920, subds. (a), (b)(1).) Appellants argue an emergency board meeting by e-mail would not be possible unless that type of meeting were a subset of the type defined by section 4090, subdivision (a). We are not persuaded.

Section 4910, subdivision (a) states, "The board shall not take action on any item of business outside of a board meeting." As noted above, the statute goes on to prohibit the board from conducting a meeting by a series of e-mails unless there is an emergency and all directors give written consent. (§ 4910, subd. (b).) Considering these subdivisions together, as we must (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190), we read them as authorizing the board, in an emergency as defined by section 4923, to dispense with notice to homeowners and to conduct a meeting and take action on a matter of association business via a series of e-mails or other electronic transmissions, provided all directors give written consent to that procedure. There would have been no need to add these specific provisions if, as appellants argue, an exchange of e-mails among directors on a matter of association business already qualified as a board meeting under section 4090, subdivision (a). We must avoid an interpretation that would make a statutory provision redundant and interpret the provision in a way that gives it independent meaning and enables it to perform a useful function. (*Plantier v. Ramona*

27

*Municipal Water Dist.* (2019) 7 Cal.5th 372, 385-386; *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476.)  We therefore read section 4910, subdivision (b) as specifying a third method, in addition to and different from those defined by section 4090, by which the board may conduct a meeting and take action on a matter of homeowners association business, and which may be used only in an emergency as defined by section 4923.  It is not a subset of the type of board meeting defined by section 4090, subdivision (a), by which the board may take action on association business matters in nonemergency situations.

Appellants contend "Corporations Code section 7211 . . . also supports the interpretation that the Legislature in general believes a board meeting is capable of being conducted by email."[3]  To confirm that belief, however, we need not look beyond the OMA.  By expressly authorizing the board of a homeowners association to hold a meeting and take action by a series of e-mails when there is an emergency and all directors consent in writing to proceed that way (§ 4910, subd. (b)(2)), the Legislature obviously believed a board meeting was capable of being conducted via e-mail.  The enactment of a

---

[3]    As pertinent to appellants' contention, the cited statute authorizes a director of a corporation to participate in a board meeting "through use of electronic transmission by and to the corporation, other than conference telephone and electronic video screen communication," provided the director "can communicate with all of the other directors concurrently" and "is provided the means of participating in all matters before the board, including, without limitation, the capacity to propose, or to interpose an objection to, a specific action to be taken by the corporation." (Corp. Code, § 7211, subd. (a)(6).)  This statute does not apply to meetings of the board of directors of a homeowners association.  The OMA provides, "Notwithstanding Section 7211 of the Corporations Code," the board "shall not conduct a meeting via a series of electronic transmissions, including, but not limited to, electronic mail," except for an emergency board meeting. (§ 4910, subd. (b).)  The use of the "notwithstanding" phrase expresses a legislative intent to have the OMA provision override the Corporations Code provision that would otherwise apply. (*Ni v. Slocum* (2011) 196 Cal.App.4th 1636, 1647.)

separate provision to authorize that type of board meeting shows, contrary to appellants' position, that the Legislature did not believe that type of meeting fell within the scope of section 4090, subdivision (a).

Apparently anticipating we might reject their arguments based on the text of the OMA, appellants advise against "exclusive and myopic reliance on statutory language," and urge consideration of "the overriding purpose of [the] OMA." That purpose, they say without any analysis or citation of authority, is to permit "all [homeowners association] members [to] have access to the [b]oard's discussions and action on official [association] business." Appellants argue their interpretation of section 4090, subdivision (a) as including the directors' e-mail exchanges at issue in this case furthers that purpose, but an interpretation that excludes them frustrates that purpose by allowing a board to make all decisions on association business via private e-mail exchanges and later hold a meeting as "mere theatre" to confirm the decisions. We disagree.

To discern the purpose of the OMA, we look to its words as the most reliable indicator of legislative intent and consider them in the context of the statute as a whole. (*Hoffmann v. Young* (2022) 13 Cal.5th 1257, 1266; *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184; *Olmstead v. Arthur J. Gallagher & Co.* (2004) 32 Cal.4th 804, 811.) The first substantive provision of the OMA states, "The board shall not take action on any item of business outside of a board meeting." (§ 4910, subd. (a).) With exceptions for emergency board meetings (§ 4923) and executive sessions (§ 4935), subsequent OMA provisions provide for input of homeowners in board actions by requiring homeowners be given at least four days' notice of a board meeting (§ 4920, subd. (a)), the notice contain the meeting agenda (§ 4920, subd. (d)), homeowners be allowed to attend and

29

speak at the meeting, (§ 4925), the board not discuss or take action on any item of business not on the agenda (§ 4930, subd. (a)), and minutes of the meeting be made available to homeowners within 30 days (§ 4950, subd. (a)). In short, the OMA "mandate[s] open governance meetings, with notice, agenda and minutes requirements, and strictly limit[s] closed executive sessions." (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 475 (*Damon*).) These various requirements make clear the purpose of the OMA is to ensure members of a homeowners association are informed about and have input into the actions to be taken by the association's board of directors on matters affecting the community in which they live. (See *Golden Eagle Land Investment, L.P. v. Rancho Santa Fe Assn.* (2018) 19 Cal.App.5th 399, 416, 417 (*Golden Eagle*) [board's "possess[ion of] broad powers to affect large numbers of individuals through [its] decisions and actions" requires "[h]olding open meetings and taking account of various opinions among community members" before acting on items of association business].)

Our interpretation of section 4090, subdivision (a) as not including the e-mail exchanges of which appellants complain does not frustrate the purpose of the OMA. Section 4090, subdivision (a) defines one method by which the board of directors of a homeowners association may act consistently with the purpose of the OMA, namely, by holding an in-person meeting where homeowners have an opportunity to voice their opinions on items of association business, and then voting on what actions to take on the items. By discussing items of Association business in e-mails (e.g., whether to approve appellants' landscaping plans and whether to fine another homeowner), the directors did nothing contrary to the purpose of the OMA, because they took no action on those items in the e-mails. Although the OMA prohibits the board from *acting on* items of Association business outside a

30

board meeting (§ 4910, subd. (a)), it does *not* prohibit the board from *discussing* the items outside a meeting.  Had the Legislature intended to prohibit such discussions, it knew how to do so.  In the Ralph M. Brown Act (Gov. Code, § 54950 et seq.), an open meeting law that governs public agencies and the provisions of which "parallel" those of the OMA (*Damon*, *supra*, 85 Cal.App.4th at p. 475), the Legislature provided:  "A majority of the members of a legislative body shall not, outside a meeting authorized by this chapter, use a series of communications of any kind, directly or through intermediaries, to discuss, deliberate, or take action on any item of business that is within the subject matter jurisdiction of the legislative body" (Gov. Code, § 54952.2, subd. (b)(1)).  Interpreting section 4090, subdivision (a) to include the e-mail exchanges at issue in this case, as appellants would have us do, would effectively add to the OMA a similar provision prohibiting directors from discussing items of association business except at a board meeting.  We refuse to adopt an interpretation of a statute that would require insertion of language the Legislature knew how to include but did not include.  (Code Civ. Proc., § 1858; *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 545; *Yao v. Superior Court* (2002) 104 Cal.App.4th 327, 332-333.)

In sum, we conclude "board meeting," as defined by section 4090, subdivision (a), is an in-person gathering of a quorum of the directors of a homeowners association at the same time and in the same physical location for the purpose of talking about and taking action on items of association business.  E-mail exchanges among directors on those items that occur before a board meeting and in which no action is taken on the items, such as those at issue in this case, do not constitute board meetings within the meaning of that provision.  The trial court therefore correctly rejected appellants' claims that the e-mail exchanges were board meetings that violated the OMA.

31

4. *Unclean Hands Defense*

Appellants' last challenge to the judgment is to the trial court's ruling that their "unclean hands" in sending the directors e-mails on matters of Association business barred them from pursuing claims that the Association violated the OMA when the directors exchanged similar e-mails among themselves. Appellants contend the doctrine of unclean hands is not available as a defense to a claim for violation of the OMA; the doctrine does not apply to the undisputed facts of this case; and principles of waiver, abandonment, or estoppel preclude the Association from asserting the defense. Because we have rejected appellants' contention that the e-mail exchanges on which they based their claims constituted board meetings to which the notice, agenda, homeowner participation, and minutes requirements of the OMA apply, their claims the Association violated the OMA by not complying with those requirements fail as a matter of law. We therefore need not, and do not, decide whether the trial court correctly applied the unclean hands doctrine to bar the claims.

B. *Appeal of Postjudgment Orders*

Appellants also attack the trial court's postjudgment orders denying their motion to strike or tax costs and granting the Association's motion for attorney fees. They contend the trial court erred by awarding attorney fees under section 5975, subdivision (c), because that section applies to actions to enforce the governing documents of a homeowners association, not to an action like theirs that seeks relief for violations of the OMA. Rather, appellants argue, the statute that applies to their action is section 4955, subdivision (b), which never allows a homeowners association to recover attorney fees from a homeowner. Appellants further contend attorney fees were not recoverable under Code of Civil Procedure section 998, because that

32

statute does not provide an independent basis to award fees, and the settlement offer the Association made under the statute was invalid for requiring a general release. As to costs, appellants contend the trial court relied on the correct statute (i.e., § 4955, subd. (b)), but erred by finding their action was "unreasonable" and therefore justified an award to the Association. They also contend the court abused its discretion by awarding the court reporter fees and "other" costs sought by the Association. Appellants ask us to reverse the challenged orders.

1.     *Appealability and Standard of Review*

"A postjudgment order which awards or denies costs or attorney's fees is separately appealable." (*Silver v. Pacific American Fish Co., Inc.* (2010) 190 Cal.App.4th 688, 693; see Code Civ. Proc., § 904.1, subd. (a)(2) [postjudgment order is appealable]; *DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 43 [postjudgment order awarding attorney fees is appealable]; *Jimenez v. City of Oxnard* (1982) 134 Cal.App.3d 856, 858, fn. 3 [postjudgment order denying motion to tax costs is appealable].) We review the trial court's determination on whether the statutory criteria for an award of costs or attorney fees have been met de novo, and its determination on the amount of costs or fees for abuse of discretion. (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751; *McGuigan v. City of San Diego* (2010) 183 Cal.App.4th 610, 622-623.) Whether an action is "frivolous," "unreasonable," or "without foundation" under a statute authorizing an award of costs or attorney fees in such an action presents a question of law we review de novo where, as here, the pertinent facts are not in dispute. (*Rudisill v. California Coastal Com.* (2019) 35 Cal.App.5th 1062, 1070; *Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1, 31-33 (*Smith*).)

2.  *Attorney Fees*

We first consider the court's award of attorney fees to the Association. Each party to an action must pay its own attorney fees unless a statute or contract requires the opposing party to pay them.  (Code Civ. Proc., § 1021; *Tract 19051 Homeowners Assn. v. Kemp* (2015) 60 Cal.4th 1135, 1142; *Srouy v. San Diego Unified School Dist.* (2022) 75 Cal.App.5th 548, 558-559.)  No contractual attorney fee provision is at issue here.  The Association therefore may recover its attorney fees from appellants only if a statute authorizes recovery.  The Association contends that because appellants' action was, at least in part, an action to enforce the governing documents of the Association and it prevailed in the action, the trial court properly awarded fees under section 5975, subdivision (c).  Appellants counter that they sued not to enforce the Association's governing documents but to enforce the OMA, which does not authorize an award of attorney fees to the Association.  As we shall explain, appellants are correct.

The governing documents of a homeowners association are enforceable in a civil action by a homeowner or by the association.  (§ 5975, subds. (a), (b).)  The Davis-Stirling Act defines "governing documents" as "the declaration and any other documents, such as bylaws, operating rules, articles of incorporation, or articles of association, which govern the operation of the common interest development or association."  (§ 4150.)  The "declaration" is the document that "contain[s] [the] legal description of the common interest development"; states whether "the common interest development is a community apartment project, condominium project, planned development, stock cooperative, or combination thereof"; and "set[s] forth the name of the association and the restrictions on the use or enjoyment of any portion of the common interest development that are intended to be

34

enforceable equitable servitudes." (§§ 4135, 4250, subd. (a).) "In an action to enforce the governing documents, the prevailing party shall be awarded reasonable attorney's fees and costs." (§ 5975, subd. (c).) An award of attorney fees to the prevailing party is mandatory in such an enforcement action. (*Champir, LLC v. Fairbanks Ranch Assn.* (2021) 66 Cal.App.5th 583, 590; *Rancho Mirage Country Club Homeowners Assn. v. Hazelbaker* (2016) 2 Cal.App.5th 252, 263; *Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024, 1039.)

To determine whether appellants sought by their action to enforce the Association's governing documents, and therefore were liable for attorney fees because they failed to do so, we examine the allegations of their complaint. (See *Gause v. Pacific Gas & Electric Co.* (1923) 60 Cal.App. 360, 367 ["the nature of the action must be determined from the allegations of the complaint"]; *Vera v. REL-BC, LLC* (2021) 66 Cal.App.5th 57, 65-66 [reviewing allegations of complaint to determine nature of action for limitations purposes].) The only express reference to the governing documents in the complaint is in a paragraph describing the Association as "a nonprofit mutual benefit association existing by and under the laws of the State of California, and . . . governed by the Davis-Stirling Act, the California Corporations Code, and the Association's governing documents, including, without limitation, its Covenants, Conditions and Restrictions ('CC&R's'), its Articles, its By-Laws, and its Community Election Rules as published in the [Association's] Community Handbook. The foregoing are collectively referred to herein as the 'Governing Laws and Rules.' " Later in the complaint appellants alluded to the governing documents by alleging they had repeatedly requested minutes of all board meetings from the Association "in accordance with the Governing Laws and Rules." The complaint nowhere mentions section 5975;

35

the charging allegations neither cite nor quote any provision of any governing document; the prayer for relief does not ask the court to enforce any provision of the governing documents; and no governing document or part thereof is attached to the complaint. We would expect to find such content in the complaint had appellants sought enforcement of the Association's governing documents under section 5975. Its absence shows this case is not that type of enforcement action.

The content of the complaint instead shows appellants sued the Association for allegedly violating the OMA. The complaint is labeled one for "**VIOLATIONS OF COMMON INTEREST DEVELOPMENT OPEN MEETING ACT [Civil Code §§ 4900, et seq.]**." Its first paragraph states that appellants "seek[ ] declaratory and equitable relief, and statutory penalties against [the Association] for violations of the [OMA]." The charging allegations of the complaint quote many provisions of the OMA, and then go on to state facts showing how the Association violated those provisions. In particular, the paragraphs referencing the "Governing Laws and Rules," which as noted include the governing statutes and documents, alleged the Association's failure to provide the board meeting minutes as requested by appellants violated the OMA, not the governing documents. Appellants prayed for a judgment declaring the Association violated the OMA and specifying the number of violations; an injunction requiring the Association to comply with the OMA; and civil penalties, costs, and attorney fees as provided in the OMA. (See § 4955.) Hence, appellants' action was plainly one to enforce the OMA, not the Association's governing documents. (See Black's Law Dict. (11th ed. 2019) p. 668 [defining "enforce" as "[t]o give force or effect to (a law, etc.); to compel obedience to"].)

36

In urging us to reach a contrary conclusion, the Association points to appellants' participation in alternative dispute resolution as statutorily required before filing an "enforcement action," certification of such participation in the complaint, and litigation of "enforcement issues" at trial as indicators that their action was one to enforce the governing documents. We are not persuaded.

The alternative dispute resolution requirements of the Davis-Stirling Act apply not only to actions to enforce the governing documents of a homeowners association, but also to actions to enforce the OMA. (§§ 5925, subd. (b) [defining "enforcement action"], 5930, subd. (a) [requiring alternative dispute resolution before filing enforcement action], 5950, subd. (a) [requiring party commencing enforcement action to file certificate regarding alternative dispute resolution efforts].) Appellants' compliance with those requirements did not transform their action to enforce the OMA into one to enforce the governing documents.

Nor did such a transformation occur as a result of appellants' litigation tactics. The questioning of the Association's directors at trial about appellants' landscaping plans, on which the Association relies for its characterization of the action, did not involve any governing document and was designed to show the Association violated the OMA when directors discussed matters in executive session that should have been discussed in a session open to all homeowners and conducted board meetings via private e-mails. Moreover, in determining the nature of the action, we find it significant that none of the governing documents were introduced at trial and that the trial court made no mention of them in its statement of decision. The court described the action as one alleging violations of the OMA and determined no such violations had occurred. The record thus shows the

37

parties litigated and the court decided claims under OMA, not claims under the Association's governing documents.

Because appellants sought to enforce the OMA, the provision of the OMA concerning costs and attorney fees governs the award in this case. (See *Department of Forestry & Fire Protection v. LeBrock* (2002) 96 Cal.App.4th 1137, 1141 [attorney fees must be "specifically authorized" by applicable statute]; *Covenant Mutual Ins. Co. v. Young* (1986) 179 Cal.App.3d 318, 321 [same].) Under that provision, "[a] member who prevails in a civil action to enforce the member's rights pursuant to this article shall be entitled to reasonable attorney's fees and court costs . . . . A prevailing association shall not recover any costs, unless the court finds the action to be frivolous, unreasonable, or without foundation." (§ 4955, subd. (b).) Construing the identically worded predecessor version (former § 1363.09, subd. (b)), the Court of Appeal concluded it authorizes the award of ordinary costs to a prevailing association in an action that is frivolous, unreasonable, or without foundation, but it does not authorize an award of attorney fees to the association in such an action. (*That v. Alders Maintenance Assn.* (2012) 206 Cal.App.4th 1419, 1427-1430; accord, *Retzloff v. Moulton Parkway Residents' Assn., No. One* (2017) 14 Cal.App.5th 742, 748-749 (*Retzloff*).) Under this authority, the Association could not recover attorney fees from appellants.[4]

---

[4] In the trial court, the Association sought attorney fees under section 4955, subdivision (b), on the ground appellants' action was "unreasonable" and "without foundation." The court did not award fees on that ground, which the Association has abandoned on appeal. The court did, however, limit the award to fees the Association incurred after appellants rejected the Code of Civil Procedure section 998 settlement offer (see fn. 1, *ante*), apparently because the court found appellants' continued litigation thereafter was "unreasonable." Code of Civil Procedure "section 998 does not

38

In sum, the trial court erred by characterizing appellants' action as one to enforce the Association's governing documents and awarding the Association attorney fees under section 5975, subdivision (c). As we have explained, appellants sought to enforce the OMA, which does not allow the Association to recover attorney fees from appellants. We therefore reverse the order granting the Association's motion for attorney fees.

3. *Costs*

We now turn to the trial court's award of costs to the Association. A homeowners association that prevails in an action alleging violations of the OMA "shall not recover any costs, unless the court finds the action to be frivolous, unreasonable, or without foundation." (§ 4955, subd. (b).) In opposition to appellants' motion to strike or tax costs, the Association argued the action was unreasonable and without foundation because appellants had unclean hands that barred the action, rejected a settlement offer "which included everything [they] were seeking," opposed the motion for summary judgment even though the Association was willing to concede limited liability to end the litigation, and kept on changing the number of OMA violations for which they sought civil penalties. The trial court found appellants' "pursuit of litigation was unreasonable at multiple stages" based on their unclean

---

grant greater rights to attorney's fees than those provided by the underlying statute," but "merely expands the group of those who are treated as prevailing parties and who therefore may be entitled to attorney's fees as prevailing parties under the relevant statute." (*Mangano v. Verity, Inc.* (2008) 167 Cal.App.4th 944, 951; see *Ford Motor Credit Co. v. Hunsberger* (2008) 163 Cal.App.4th 1526, 1532 [Code Civ. Proc., § 998 "does *not* independently create a statutory right to attorney fees"].) Because the relevant statute (§ 4955, subd. (b)) gave the Association no right to recover attorney fees from appellants, Code of Civil Procedure section 998 did not authorize the fee-shifting ordered by the court.

hands and rejection of a reasonable settlement offer, and denied their motion to strike or tax costs. The court erred in so doing, as we explain below.

Neither the OMA nor any published opinion defines "frivolous," "unreasonable," or "without foundation" as those terms are used in section 4955, subdivision (b). Such terms, however, are used in other cost-shifting statutes that courts have construed. For example, in *Smith*, *supra*, 188 Cal.App.4th 1, the Court of Appeal construed Business and Professions Code section 809.9, which authorizes an award of costs and attorney fees to the prevailing party "if the other party's conduct in bringing, defending, or litigating the suit was frivolous, unreasonable, without foundation, or in bad faith." The Court of Appeal adopted the view that "a matter is *frivolous* if any reasonable attorney would agree it is completely without merit in the sense that it lacks legal grounds, lacks an evidentiary showing, or involves an unreasonable delay." (*Smith*, at p. 33, italics added; see *Retzloff*, *supra*, 14 Cal.App.5th at pp. 752-753 [adopting same definition for "frivolous" as used in § 5235, subd. (c)].) The Court of Appeal held an action is "without foundation" if there is no direct or circumstantial evidence supporting the plaintiff's factual assertions, or if there is no statute, regulation, case law, or other legal authority supporting the plaintiff's legal contentions. (*Smith*, at pp. 30-31.) For the term "unreasonable," the Court of Appeal adopted the "any-reasonable-attorney standard," which asks "whether any reasonable attorney would have thought the claim tenable" based on "the facts known to the plaintiff when [it] filed or maintained the action." (*Id.* at p. 32.)[5] The

---

[5]     We reject appellants' contention that costs could be awarded to the Association only if the trial court found the entire action was unreasonable when it was filed. Our Supreme Court has held that when a defendant may recover costs for defending a " 'frivolous, unreasonable, or groundless' " action, recovery is available if "the court finds the action was objectively

terms "frivolous," "unreasonable," and "without foundation" partially overlap, since to determine whether an action may be described by any one of them requires the court to assess the grounds underlying the plaintiff's factual or legal positions and the reasoning process linking those grounds to the ultimate conclusions advocated by the plaintiff. (*Smith*, at p. 33.) To decide whether appellants' action qualifies as any of the quoted terms, we shall apply the *Smith* court's definitions.

We first consider whether appellants' unclean hands made their prosecution of the action "unreasonable," as the Association urged and the trial court found. The trial court's ruling that the unclean hands doctrine barred the action does not necessarily lead to the conclusion that the " ' "action must have been unreasonable or without foundation." ' " (*Pollock*, *supra*, 11 Cal.5th at p. 951 [cautioning against such " ' "hindsight bias" ' " when awarding costs].) We need not delve deeply into the unclean hands doctrine, nor decide definitively whether the trial court correctly applied the doctrine, to decide whether appellants' action was "unreasonable" within the meaning of section 4955, subdivision (b). The applicability of the unclean hands doctrine to appellants' action was sufficiently debatable that a reasonable attorney could have concluded the doctrine did not bar the action.

without foundation when brought, *or the plaintiff continued to litigate after it clearly became so.*" (*Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 101, 115, italics added; accord, *Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 951 (*Pollock*).) As the *Smith* court implicitly recognized, an action that was not unreasonable when filed may become so later if factual discoveries or legal developments make the action untenable, because the court must "analyz[e] the facts known to the plaintiff when he or she filed *or maintained* the action" to determine whether it was unreasonable. (*Smith*, *supra*, 188 Cal.App.4th at p. 32, italics added; cf. *Zamos v. Stroud* (2004) 32 Cal.4th 958, 970 ["continuing to prosecute a lawsuit discovered to lack probable cause" is unreasonable and subjects attorney to liability for malicious prosecution].)

To decide whether to apply the unclean hands doctrine, which prevents a plaintiff from profiting from its own inequitable conduct in a transaction by barring relief on a directly related cause of action (*DD Hair Lounge, LLC v. State Farm General Ins. Co.* (2018) 20 Cal.App.5th 1238, 1246; *Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 638-639), one factor courts consider is analogous case law (*Jay Bharat Developers, Inc. v. Minidis* (2008) 167 Cal.App.4th 437, 445-446; *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1060). This court and others have held the unclean hands doctrine cannot be applied to defeat claims under statutes designed to protect one class of persons from the activities of another. (See, e.g., *East West Bank v. Rio School Dist.* (2015) 235 Cal.App.4th 742, 752; *Mendoza v. Ruesga* (2008) 169 Cal.App.4th 270, 279; *Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 544.) The OMA may qualify as that type of statute in that it protects homeowners by prohibiting the board of directors of the homeowners association from holding secret meetings at which it takes action on matters directly affecting the homeowners and their community. (See §§ 4910, subd. (a), 4925; *Golden Eagle*, *supra*, 19 Cal.App.5th at p. 416; *Damon*, *supra*, 85 Cal.App.4th at p. 475.) It was therefore at least arguable under existing case law that as a matter of law the unclean hands doctrine did not bar appellants' claims for violations of the OMA. (See *East West Bank*, at p. 752 [unclean hands doctrine did not apply as a matter of law when no analogous case law supported application]; *Smith*, *supra*, 188 Cal.App.4th at p. 41 [position is arguable when consistent with language in some cases].) Because a reasonable attorney could have concluded the claims were not barred, appellants' decision to pursue them was not "unreasonable" (or "frivolous" or

42

"without foundation") within the meaning of section 4955, subdivision (b). (*Smith*, at pp. 30-33 [defining quoted terms].)

We next consider whether appellants' rejection of the Association's settlement offer (see fn. 1, *ante*) shows their continued pursuit of the action was "unreasonable" (§ 4955, subd. (b)), as the trial court found. Again, we must resist the distorting effect of " ' "hindsight bias" ' " and not conclude that decision " ' "must have been unreasonable or without foundation" ' " simply because appellants recovered nothing at trial when they could have settled for $25,000.01 plus costs and attorney fees. (*Pollock*, *supra*, 11 Cal.5th at p. 951.) Rejection of a reasonable settlement offer (i.e., one within the range of reasonably possible trial results) may indicate bad faith (i.e., unreasonable litigation conduct). (*Covert v. FCA USA, LLC* (2022) 73 Cal.App.5th 821, 834 (*Covert*); *Pinto v. Farmers Ins. Exchange* (2021) 61 Cal.App.5th 676, 688.) Any assessment of the reasonableness of the offer must take into account the information known or available to the parties at the time of the offer. (*Covert*, at p. 834; *Arno v. Helinet Corp.* (2005) 130 Cal.App.4th 1019, 1025.)

When the Association made its offer, there was no case law on whether e-mail exchanges of the type of which appellants complained constituted board meetings in violation of the OMA, and if so, how many violations occurred in the exchanges. The parties' positions on those issues varied all the way through the end of trial. The amount of civil penalties, if any, appellants were likely to recover was thus uncertain. Moreover, civil penalties were not the only remedy appellants sought; they also requested declaratory and injunctive relief. The Association did not agree to any such relief in the settlement offer, which therefore did not "include[ ] everything [a]ppellants were seeking," as the Association erroneously asserts. To the contrary, the offer required appellants to release their claims for declaratory

43

and injunctive relief, as well as any other claims "that could have been asserted by [appellants] in relation to the allegations of the Complaint." "Requiring resolution of potential unfiled claims not encompassed by the pending action renders the offer incapable of valuation." (*Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 87.)

Given the difficulty in valuation and the uncertainty in the law, it is unclear whether the Association's settlement offer was " 'within the "range of reasonably possible results" at trial.' " (*Covert, supra*, 73 Cal.App.5th at p. 834.) We thus cannot say that no reasonable attorney would have rejected the offer, so that to have done so was "unreasonable" (or "frivolous" or "without foundation") within the meaning of section 4955, subdivision (b). (*Smith, supra*, 188 Cal.App.4th at pp. 30-33 [defining quoted terms].)

The Association offers grounds in addition to those relied on by the trial court to affirm the award of costs. It argues appellants' action was "frivolous, unreasonable, or without foundation" (§ 4955, subd. (b)) because appellants: (1) failed to produce any evidence to support their claim for injunctive relief, which was summarily adjudicated against them; (2) opposed the Association's attempt to resolve the matter by motion for summary judgment by conceding liability for 10 civil penalties; and (3) kept on changing their position on the number of OMA violations to prolong the litigation and to deplete the Association's resources. We are not persuaded.

We disagree with the Association's contention that the adverse summary adjudication ruling shows appellants' request for injunctive relief was "unreasonable and without foundation." In opposition to the Association's motion for summary judgment/adjudication, appellants presented evidence the Association had failed to produce minutes for certain board meetings, and argued the failure violated the OMA and warranted

44

injunctive relief. The OMA requires the production of minutes of board meetings and authorizes injunctive relief. (§§ 4950, subd. (a), 4955, subd. (a).) Although the trial court ruled against appellants on the ground they had not met their burden to establish the threat of future harm (see, e.g., *Connerly v. Schwarzenegger* (2007) 146 Cal.App.4th 739, 751 ["Without a threat of present or future injury, no injunction can lie."]), their request for injunctive relief was not so lacking in legal or evidentiary support that no reasonable attorney would have pursued it. (See *Smith*, *supra*, 188 Cal.App.4th at pp. 30-33 [discussing meanings of "unreasonable" and "without foundation"].)

We also disagree that appellants' refusal to accept the number of civil penalties the Association was willing to concede to resolve the case by summary judgment and their later changes in position on the number of penalties they were seeking justify the award of costs. The trial court denied the summary judgment motion on the grounds that appellants had raised triable issues of fact on the number of OMA violations for which a penalty could be imposed and the OMA was ambiguous on whether a separate penalty could be awarded to each appellant for each violation. That denial precludes a finding that no reasonable attorney would have thought appellants' position tenable. (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 824; *Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 183-185.) After denial of the summary judgment motion, the parties continued to litigate the case on the assumption the directors' e-mail exchanges challenged in the complaint violated the OMA. Not until the end of trial, in response to questioning by the court, did the Association take the position the exchanges were not board meetings within the meaning of the OMA. Given the parties' shared erroneous assumption,

45

the number of e-mails involved, and the lack of case law on point, appellants' changing position on the number of violations subject to a civil penalty was not so lacking in factual or legal support that it was "frivolous, unreasonable, or without foundation." (§ 4955, subd. (b); see *Smith, supra*, 188 Cal.App.4th at pp. 30-33 [defining quoted terms].)

The Association also argues it is entitled to recover costs under Code of Civil Procedure section 998, subdivision (c)(1), which requires a plaintiff that rejects a defendant's settlement offer and does not obtain a more favorable judgment to pay the defendant's postoffer costs. We disagree. The cost-shifting provisions of that statute do not apply when a more specific cost-shifting statute applies to the claims at issue. (*Cruz v. Fusion Buffet, Inc.* (2020) 57 Cal.App.5th 221, 240-241; *Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (2018) 19 Cal.App.5th 525, 551-553.) Under the OMA, "[a] prevailing association shall not recover any costs, unless the court finds the action to be frivolous, unreasonable, or without foundation." (§ 4955, subd. (b).) Because we have determined appellants' action does not meet that description, the Association is not entitled to costs.

In sum, we conclude the OMA precluded the Association from recovering any costs from appellants. We therefore need not, and do not, decide whether the particular items appellants have challenged (i.e., court reporter fees and "other" costs) were recoverable. We reverse the order denying appellants' motion to strike or tax costs, and direct the trial court on remand to deny all costs and strike the amended judgment awarding costs.

## III.

## DISPOSITION

The judgment is affirmed. The order denying appellants' motion to strike or tax costs is reversed. The order granting the Association's motion

46

for attorney fees is reversed.  The matter is remanded to the trial court with directions:  (1) to vacate the order denying appellants' motion to strike or tax costs, and to enter a new order granting the motion and denying all costs; (2) to vacate the order granting the Association's motion for attorney fees, and to enter a new order denying the motion; and (3) to strike the amended judgment.  In the interest of justice, the parties shall bear their own costs on appeal.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.

47